[Crim. No. 5022. Fourth Dist., Div. One. Nov. 10, 1972.]

THE PEOPLE, Plaintiff and Respondent, v.
LORISE JOHNSON, Defendant and Appellant.

COUNSEL

William S. Bannasch, under appointment by the Court of Appeal, for Defendant and Appellant.

Evelle J. Younger, Attorney General, Edward A. Hinz, Jr., Chief Assistant Attorney General, William E. James, Assistant Attorney General, Jay D. Coulter and Alan S. Meth, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

AULT, J.—On February 10, 1972, Lorise Johnson shot and killed his accomplice, Vanderbilt Austin, during an attempted robbery of an insurance company office in San Diego. Indicted for Austin's murder, and convicted by the court of murder in the first degree, Johnson appeals, contending: (1) The felony-murder rule was inapplicable because: (a) his diminished capacity, brought about through drug ingestion, negated any specific intent to rob; (b) the killing was accidental, without malice, and separate and distinct from the robbery transaction. (2) His waiver of a jury trial was ineffective because it was a result of an agreement with the prosecutor,

motivated solely by his desire to avoid the death penalty. We find no error and affirm the judgment.

About noon on February 10, 1971, Johnson and Austin entered the office of the Golden State Mutual Life Insurance Company on Ocean View Boulevard and asked the cashier, Brenda Stevens, for some local street directions. A few minutes later they returned to rob the office which was then occupied by three employees. Johnson pointed a gun at the manager, Lorne Oliver, and said, "It's a stick-up. We want the money." Austin took Lloyd Mumford's wallet at knife-point.

While Austin remained in the front office, Johnson forced the three insurance company employees to accompany him down some stairs and into a back room to see if other persons were present. En route he said, "This is for real. Brother, the revolution is now." About this time Oliver offered to show Johnson where the money was located and started moving back up the stairs toward the front door and office. Johnson repeatedly ordered him to stop, but without success. When Oliver reached the top of the stairs, Johnson pointed the gun at Mrs. Stevens and said, "If you don't stop, I'll shoot her." He continued to follow Oliver up the stairs, finally calling out to Austin to stop him.

As Oliver ran toward the front door, Austin ran toward Oliver, and Johnson's gun discharged. The bullet struck Austin in the head and killed him. Oliver continued running out the front door and called the police. Johnson escaped down the alley. No money was taken from the office. Two money bags containing $145 were found under Austin's body, and another bag containing $2,200 was found nearby. Mumford's wallet was found in Austin's pants' pocket.

Johnson fled to his home a few blocks away where he had been living with Barbara Wall. He told Mrs. Wall that John Paul had been shot and said he hoped he had not done it. [Vanderbilt Austin was also known as John Paul.] He showed Mrs. Wall some spots on his sweater and said they looked like "brains." He asked Mrs. Wall to drive by the insurance company office. She did and telephoned back, reporting she had seen police cars and a news truck in front of the office. When she returned home, Johnson told her he did not want money at the expense of John Paul's death and said, "He ran into the gun. It went off accidentally." He also told Mrs. Wall he had blood and brains on his sweater, there had been blood all over the insurance company office, and that he had seen blood coming from John Paul's head.

Johnson later burned his sweater in the bathtub and cut up his undershirt and flushed it down the commode. He hid the gun in a canyon, but later

retrieved it. Three nights after the attempted hold-up the police surrounded his house, filled it with tear gas, and ordered him to come out. Johnson complied and was immediately placed under arrest. He had 38 amphetamine pills on his person when arrested. The gun, later identified as the one which had fired the bullet killing Austin, was found hidden under the refrigerator in his home. The three insurance company employees all identified Johnson as the robber with the gun.

Johnson testified he had been consuming large quantities of drugs since losing his job about a month before the shooting. He had been taking "Dexamyl Spatulas" [Dexedrine Spansules] prescribed by a doctor and "mini-bennies" which he had obtained without a prescrption. He told of purchasing 100 "mini-bennies" on the night of February 9 and of consuming 60 of them before 10 o'clock the next morning. He testified he had not slept for three or four days before February 10, and that he had been having hallucinations and lapses of memory. Barbara Wall corroborated Johnson's testimony regarding drug consumption, but she also related many statements he had made to her about the shooting.

While Johnson did not concede his participation in either the attempted robbery or the killing at the trial, his complete involvement in both was conclusively demonstrated. He relied primarily on the defense of diminished capacity, caused by his consumption of drugs. On appeal, he argues the trial court failed to give adequate consideration to evidence of diminished capacity, which he asserts negated any intent to commit robbery and thus made the felony-murder rule inapplicable. (See *People* v. *Anderson,* 63 Cal. 2d 351, 358 [46 Cal.Rptr. 763, 406 P.2d 43]; *People* v. *Chapman,* 261 Cal.App.2d 149, 160 [67 Cal.Rptr. 601].)

The record, however, shows the trial court carefully considered Johnson's claim of diminished capacity as it bore on his ability to formulate the intent to rob, weighed it against his statements and conduct before, during, and after the attempted robbery, and found he was capable of forming, and did in fact form, the intent to rob. The finding is supported by substantial evidence. The intent to commit a particular crime is generally manifested by the circumstances connected with the offense (Pen. Code, § 21) and the specific intent to rob may be inferred from the circumstances connected with the robbery (*People* v. *Rodriguez,* 272 Cal.App.2d 80, 86 [76 Cal.Rptr. 818]). Johnson's actions and commands during the robbery attempt clearly indicated the capacity and intent to rob; his later statements to Barbara Wall showed he was well aware of what had happened.

Whether Johnson possessed the intent to rob was a question to be de-

termined by the trier of fact (*People* v. *Fortman*, 257 Cal.App.2d 45, 52 [64 Cal.Rptr. 669]). Where the evidence supports the trial court's finding, an appellate court may not reverse merely because the circumstances might also be reconciled with a contrary finding (*People* v. *Mosher*, 1 Cal.3d 379, 395 [82 Cal.Rptr. 379, 461 P.2d 659]). An appellate court may not reweigh the evidence (*People* v. *Kemp*, 55 Cal.2d 458, 471 [11 Cal.Rptr. 361, 359 P.2d 913]).

■ Under the felony-murder rule of Penal Code section 189, a killing committed in the course of a robbery or an attempted robbery is first degree murder ". . . whether the killing is wilful, deliberate and premeditated, or merely accidental or unintentional, and whether or not the killing is planned as a part of the commission of the robbery." (*People* v. *Stamp*, 2 Cal.App.3d 203, 209 [82 Cal.Rptr. 598].) ■ While the rule may not be invoked unless the killing is by the robber or his accomplice (*People* v. *Washington*, 62 Cal.2d 777, 781 [44 Cal.Rptr. 442, 402 P.2d 130]), it is applicable where the person killed is an accomplice and not the robbery victim (*People* v. *Cabaltero*, 31 Cal.App.2d 52, 58 [87 P.2d 364]). "[T]he purpose of the felony-murder rule is to deter persons from killing negligently or accidentally by holding them strictly responsible for *all* killings they commit during the perpetration, or attempted perpetration, of any of the enumerated felonies." (*People* v. *Talbot*, 64 Cal.2d 691, 704 [51 Cal. Rptr. 417, 414 P.2d 633], overruled on other grounds in *People* v. *Wilson*, 1 Cal.3d 431, 442 [82 Cal.Rptr. 494, 462 P.2d 22].) Johnson's culpability is the same as it would have been had the bullet he fired struck and killed Oliver instead of Austin.

His claim Austin's killing was separate and distinct from the robbery transaction simply ignores the evidence. ■ Austin was shot on the premises where the robbery was attempted while the attempt was in full swing. The homicide need not have been committed "to perpetrate" the robbery; it is sufficient that the two acts be part of one continuous transaction. (*People* v. *Chavez*, 37 Cal.2d 656, 670 [234 P.2d 632]; *People* v. *Stamp*, *supra*, 2 Cal.App.3d 203, 210.) The evidence clearly shows the requirement was met.

■ The felony-murder doctrine presumes malice aforethought from the commission, or the attempt to commit, any of the felonies listed in Penal Code section 189. ■ Malice aforethought is presumed in this instance from Johnson's armed entry into the insurance company office with the intent to commit robbery. (*People* v. *Stamp*, *supra*, 2 Cal.App.3d 203, 210.)

■ The major issue raised on appeal concerns the circumstances sur-

rounding Johnson's waiver of his right to a jury trial. After the jury was impaneled he agreed to waive his right to a trial by jury in exchange for the prosecution's promise not to seek the death penalty. The trial court approved the agreement, tried the case, found Johnson guilty of first degree murder, and sentenced him to life imprisonment.

Some eight months later *People* v. *Anderson,* 6 Cal.3d 628 [100 Cal. Rptr. 152, 493 P.2d 880], held the death penalty unconstitutional and declared the ruling retroactive so that any person under a death sentence could petition to modify the sentence to life imprisonment. (*People* v. *Anderson, supra,* p. 657.) This change in law is the basis of Johnson's contention his agreement to waive a jury trial, induced by fear of the death penalty, is now offensive, should not be allowed to stand, and requires the reversal of his conviction. We disagree.

The fairness of an agreement is gauged by the values existing when the bargain is made. When Johnson waived his right to a jury trial, the threat of the death penalty was a real and significant factor. The fact the death penalty was later declared unconstitutional should not be permitted to vitiate the waiver, even though fear of its imposition may have been a motivating factor in bringing it about.

The holding in *Anderson* should not be given the retroactive effect contended for here, and nothing in the decision itself implies that it should. Full retroactivity is granted decisions which are closely related to the factfinding process, but is denied to those decisions which merely collaterally affect that process. (*In re Johnson,* 3 Cal.3d 404, 410-416 [90 Cal.Rptr. 569, 475 P.2d 841].) A change of law relating to penalty has no relation whatsoever to the fact-finding process. The retroactive effect of *Anderson* should be limited to those cases in which the death penalty had been assessed. Its application should not be extended to cases where consideration of the possibility of the imposition of the death penalty merely affected a course of conduct designed to avoid its consequences.

Our conclusion is analogous to that reached in *Brady* v. *United States,* 397 U.S. 742 [25 L.Ed.2d 747, 90 S.Ct. 1463], which upheld the validity of a plea of guilty entered before the death penalty provisions of the Federal Kidnaping Law were declared unconstitutional in *United States* v. *Jackson,* 390 U.S. 570 [20 L.Ed.2d 138, 88 S.Ct. 1209]. It is also compatible with the Supreme Court's reasoning in *Parker* v. *North Carolina,* 397 U.S. 790 [25 L.Ed.2d 785, 90 S.Ct. 1458] and *North Carolina* v. *Alford,* 400 U.S. 25 [27 L.Ed.2d 162, 91 S.Ct. 160], which considered similar problems. In *Parker, supra,* the court said: "It may be that under

*United States* v. *Jackson,* 390 U.S. 570 . . . , it was unconstitutional to impose the death penalty under the statutory framework which existed in North Carolina at the time of Parker's plea. Even so, we determined in *Brady* v. *United States* [397 U.S. 742] that an otherwise valid plea is not involuntary because induced by the defendant's desire to limit the possible maximum penalty to less than that authorized if there is a jury trial. In this respect we see nothing to distinguish Parker's case from Brady's." (*Parker* v. *North Carolina,* 397 U.S. 790, 794-795 [25 L.Ed.2d 785, 790-791, 90 S.Ct. 1458, 1461].)

■ The entry of a plea of guilty necessarily includes the requirement of an intelligent waiver of the right to a trial by jury. (*Boykin* v. *Alabama,* 395 U.S. 238, 243-244 [23 L.Ed.2d 274, 279-280, 89 S.Ct. 1709, 1712]; *In re Tahl,* 1 Cal.3d 122, 130 [81 Cal.Rptr. 577, 460 P.2d 449].) If such a plea, even though induced by a desire to avoid the possible imposition of the death penalty, stands when that penalty is later declared unconstitutional, it follows the waiver of the less extensive and included right to trial by jury also survives in the same circumstance.

No contention is made the jury waiver was not valid in all other respects.

The judgment is affirmed.

Whelan, Acting P. J., and Cologne, J., concurred.