[No. F002682. Fifth Dist. Apr. 5, 1985.]

THE PEOPLE, Plaintiff and Respondent, v.
ROY MATTHEW CAMENISCH, Defendant and Appellant.

**[Opinion certified for partial publication.[1]]**

[1]Part I of this opinion is not published as it does not meet the standards for publication. (Cal. Rules of Court, rules 976(b) and 976.1.)

**COUNSEL**

Kyle Gee, under appointment by the Court of Appeal, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Nancy L. Sweet, Edmund McMurray, Michael T. Garcia and Jane Lamborn, Deputy Attorneys General, for Plaintiff and Respondent.

## Opinion

**HAMLIN, J.**—Roy Matthew Camenisch was charged with murder (Pen. Code, § 187).[2] The information alleged as special circumstances that defendant committed the murder during the commission of a robbery (§ 190.2, subd. (a)(17)(i)) and a burglary (§ 190.2, subd. (a)(17)(vii)). The information separately charged defendant with robbery (§ 211) and burglary (§§ 459, 460); it also contained allegations that defendant personally used a knife in committing each offense charged (§ 12022, subd. (b)).

After the trial court denied defendant's motions to strike the special circumstances, to suppress all confessions of defendant, to suppress evidence based on quashing a search warrant, and to grant defendant other forms of relief, but before the trial actually began, defendant pleaded guilty to murder, robbery and burglary. Defendant also admitted that he committed the murder during the commission of a robbery and a burglary and that he personally used a knife in the commission of the murder. The trial court sentenced defendant to state prison for life without possibility of parole, imposed an additional one-year term on the enhancement for use of a knife, and imposed but stayed separate sentences on the robbery and burglary convictions. Defendant's sentence was in accord with his plea bargain. He appealed.

Defendant urges that his conviction must be reversed and he must be allowed an opportunity to consider withdrawal of his guilty plea because he was not adequately advised of the effect of his guilty plea on his right to appeal. Additionally, defendant contends he should have the option to withdraw his admission of the special circumstance allegation because the trial court incorrectly advised him of the elements of the special circumstance. We will conclude that defendant's contentions are unmeritorious and affirm the judgment.

## The Facts

Because defendant appeals after his guilty plea, we take our statement of facts from the probation report.

On July 20, 1981, Bakersfield police responded to the scene of a residential fire which had been reported two days previously (July 18 at 2:30 a.m.). The police found the body of Edwin Buck in a Honda automobile parked in Buck's garage; both the body and the car had been badly burned. When the body was removed from the car, "what appeared to be a stab wound was

---

[2]All further statutory references are to the Penal Code unless otherwise stated.

observed in the upper left chest area." An autopsy disclosed Buck had died as the result of multiple stab wounds and internal hemorrhage.

The victim's two sons advised police that their father's 1973 Ford Thunderbird was missing, as well as a microwave oven and a small television.

On July 21 an anonymous informant told police that one Robert M. (hereafter Robert) had been involved in the homicide and was in possession of the Thunderbird. Robert later called the police and told them he wished to cooperate. He stated he had only just learned on the nightly news that the police were looking for an unidentified white male who had been seen with Buck on the night preceding the fire. Robert identified himself as that person.

Robert told police he had met Buck some two years previously in a public restroom at Beach Park. He had seen Buck only twice prior to meeting him again at Beach Park about seven to eight weeks before Buck's death. On July 17 Robert and Buck met to plan a weekend outing and, after spending some time at Buck's residence, left for Beach Park in Buck's automobile. (Although the first reference to this vehicle described it as a Lincoln, all subsequent references were to a Honda.) Robert stated he went home from the park after about an hour and a half and returned to Beach Park the following morning (July 18) at about 10 a.m. to meet Buck for their outing.

Robert told police that when Buck failed to show up that morning, Robert left the park and, among other stops, visited a friend, Kelly G. (hereafter Kelly), at the San Felipe Boys' Home. However, when Kelly was interviewed, he told the police Robert had admitted to Kelly that he, Robert, and someone identified as John had been directly involved in Buck's death. Robert told Kelly that Robert and John had taken Buck to an area near the airport where John hit Buck in the head with a hammer three times and then cut Buck's throat to be certain he was dead.

Robert was arrested for murder. On his way to juvenile hall Robert told the transporting officers he wished to make a statement. He then pointed out to the police the crime scene, an isolated area north of Oildale, and told the police that numerous items taken from the Buck residence were at the home of the other subject involved, identified by Robert as "Matt" (defendant). Robert also told the police the location of Matt's house.

Robert admitted that he and Matt had planned the murder and robbery on Thursday night, July 16. Robert stated that Matt was to follow Robert and Buck to Buck's residence on July 17, where they would commit the crime. However, Robert observed Matt following him and Buck on their way to

Beach Park. When Robert, driving Buck's car, pulled over to the side of the road, Matt also pulled over and stopped in front of them.

Robert stated Matt said he was "going to take care of him right there." Robert, claiming he wanted nothing to do with the murder, waited for about five minutes in Matt's car. When he returned to Buck's vehicle, he saw Buck lying on the ground, groaning and breathing hard. When Robert pointed this out to Matt, Matt got a knife from his car and slashed Buck's throat. After leaving the scene, both searched Buck's pockets for money.. They then returned to Buck's residence, with Buck's body in the back of the Honda, and gained access with an automatic garage door opener. They took numerous personal belongings from the residence, loading them into Buck's Thunderbird. Prior to leaving, Matt threw a lighted match into the Honda.

Robert told police that the plan to kill Buck had been conceived because Robert was angry at Buck for making sexual advances to him. During discussions with Matt and another person, identified as "Bob," Matt indicated he could accomplish the killing. Robert was to keep the Honda, while Matt got Buck's Ford Galaxie and Bob the Thunderbird. Robert never took the Honda since it was covered with blood.

The police then obtained and served a warrant to search the residence Robert had pointed out to them as belonging to Matt. Defendant was taken into custody. Various items taken from the Buck residence were found in the bedroom where defendant had been sleeping. Prior to any questions being asked of him or any advisement of his *Miranda*[3] rights, defendant stated he wanted to talk to an attorney. Once at the police station, however, defendant apparently changed his mind and made a statement to the investigating officer.

Defendant admitted that after a conversation with Robert in the early afternoon of July 17, defendant agreed to assist Robert in Buck's murder. After Robert came by defendant's residence later that evening to advise defendant that Robert and Buck would be going out in Buck's Honda, defendant followed the two to a location north of the Bakersfield Speedway where Robert pulled off the road and stopped.

Defendant and Robert had a brief conversation during which both expressed some hesitancy or reservations about the murder but decided to carry out their original plan. Defendant had brought a large knife, a hammer, and a shovel in his car. He got the knife, approached the passenger

---

[3]*Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974].

side of the Honda where Buck was seated, and "without saying anything stabbed the victim once in the chest."

Defendant then entered the car and continued to stab Buck, who was calling out to Robert for help. Robert had gotten the hammer from defendant's car and handed it to defendant, who then began striking Buck in the head. In the meantime, Robert had retrieved the knife; Robert then began stabbing Buck. When Buck stopped breathing, they placed his body in the rear of the Honda. After a stop at defendant's residence where (according to defendant) he ate a sandwich (although, according to Robert, he took a shower), the two made one stop with the body in the back of the car and removed Buck's wristwatch, which was given to Robert. They then drove to Buck's home and began loading personal property into a green Lincoln Continental parked in the garage. Defendant used a pocketknife to slice the front seat of the Honda, exposing the foam rubber padding to permit better ignition. Robert set fire to the car. The two then drove away in the Lincoln and later divided the property.

## DISCUSSION

I. *Was defendant inadequately advised that by pleading guilty he would give up his right to appeal the denial of numerous pretrial motions, thus mandating defendant be given an opportunity to consider withdrawing his guilty plea?*\*

. . . . . . . . . . . . . . . . . . . . .

II. *Is defendant entitled to withdraw his guilty plea based on the Supreme Court's ruling in Carlos v. Superior Court (1983) 35 Cal.3d 131 [197 Cal.Rptr. 79, 672 P.2d 862]?*

As defendant phrases this issue, "The trial court erred in denying Mr. Camenisch's motion to bar the death penalty unless intent to kill were proven; Mr. Camenisch should be granted the option of withdrawing his plea, and having the matter proceed with instructions to the trial court that he be given the benefit of the *Carlos* ruling." In *Carlos* v. *Superior Court, supra,* the court concluded: "The wording of the initiative, its purpose as explained to the voters, the principle that penal statutes should be construed to give the defendant the benefit of reasonable doubt, and the companion principle that statutes should be construed to avoid substantial questions of their constitutional validity—all unite to support the conclusion that the felony mur-

---

\*See footnote 1, *ante.*

der special circumstance of the 1978 initiative requires proof that the defendant intended to kill. Specifically, we construe the word 'intentionally' in subdivision (b) of section 190.2 to apply to all defendants—actual killers and accomplices alike—and to require an intent to kill before a defendant is subject to a special circumstance finding under paragraph 17 of that section." (*Id.*, at pp. 153-154. See also *People* v. *Turner* (1984) 37 Cal.3d 302, 328 [208 Cal.Rptr. 196, 690 P.2d 669].) The questions, therefore, which must be addressed in this appeal are those which were the subject of this court's request for supplemental briefing of July 16, 1984, to wit:

(1) Assuming that the rule of *Carlos* v. *Superior Court, supra,* 35 Cal.3d 131 applies retroactively to the instant case, was defendant correctly advised of the elements of the special circumstance which he admitted?

(2) On the same assumption as question (1), does the record contain an adequate factual basis for admitting the special circumstances?

(3) What is the significance, if any, of the decision in *People* v. *Powers* (1984) 151 Cal.App.3d 905 [199 Cal.Rptr. 142]?

Initially, it is not necessary to assume retroactive application of the *Carlos* decision since the Supreme Court determined in *People* v. *Garcia* (1984) 36 Cal.3d 539, 549 [205 Cal.Rptr. 265, 684 P.2d 826], as modified at 37 Cal.3d 234a, that *Carlos* would be fully retroactive to all cases not yet final. Moreover, the court in *Garcia* articulated the standard of review for *Carlos* error as reversal per se, with four limited exceptions: (1) " 'if the erroneous instruction was given in connection with an offense for which the defendant was acquitted and if the instruction had no bearing on the offense for which he was convicted' "; (2) " 'if the defendant conceded the issue of intent' "; (3) if, " '. . . although an instruction . . . was erroneously omitted, the factual question posed by the omitted instruction was necessarily resolved adversely to the defendant under other, properly given instructions . . .' "; and (4) if all the evidence presented establishes the necessary intent element of the erroneous or omitted instruction and there is no contrary evidence worthy of consideration. (*Id.*, at pp. 554-556. See also *People* v. *Whitt* (1984) 36 Cal.3d 724, 734-736 [205 Cal.Rptr. 810, 685 P.2d 1161].)

In *Garcia* the Supreme Court noted that the first two exceptions have been recognized by the United States Supreme Court and speculated that the third and fourth exceptions might find similar acceptance. However, the court concluded in *Garcia* that none of the exceptions was applicable, and the judgment was reversed.

Turning then to the questions before this court, two general principles must be kept in mind. ▄ The first is simply that *Carlos* v. *Superior*

*Court, supra,* 35 Cal.3d 131 does not create a new rule nor overturn the existing law (see analysis of retroactive application in *People* v. *Garcia, supra,* 36 Cal.3d at p. 549). *Carlos* only holds that in order to impose a sentence of death or life in prison without possibility of parole, the finder of fact must determine that a killing during the course of certain enumerated felonies was intentional. Secondly, in the instant case we are not dealing with an improperly instructed factfinder; this appeal does not follow a conviction after jury trial but rather is taken from defendant's plea of guilty.

■   To sustain an ensuing judgment, a plea of guilty must be "voluntary in a constitutional sense" (*Henderson* v. *Morgan* (1976) 426 U.S. 637, 645 [49 L.Ed.2d 108, 114, 96 S.Ct. 2253]), and it "may be withdrawn for mistake, ignorance, or inadvertence or any other factor overreaching defendant's free and clear judgment." (*People* v. *Urfer* (1979) 94 Cal.App.3d 887, 892 [156 Cal.Rptr. 682]. See also this court's opinion in *People* v. *Tabucchi* (1976) 64 Cal.App.3d 133 [134 Cal.Rptr. 245].)

■   In light of the full retroactivity afforded the *Carlos* decision in all cases not yet final, it is clear defendant was not correctly advised of an element of the special circumstances which he admitted. The prosecutor examined defendant in detail about the circumstances surrounding the death of Edwin Buck and the later taking of his property. While the prosecutor established that defendant's intent to take Buck's property preceded the assault which resulted in Buck's death, the prosecutor did not advise defendant that the prosecution would have to prove at trial the killing was intentional in order for the finder of fact to return a true finding on either of the special circumstances. Analogizing to *Carlos* and the 1984 revision of CALJIC No. 8.81.17 (4th ed. 1984 pocket pt.) requiring the jury to find "[t]hat the defendant intended to kill a human being," a defendant now admitting a special circumstance based on a death occurring during the commission of a felony must be advised of the necessary intent element, i.e., the homicide must be proven to be an intentional one. That defendant was not so advised is clear, and this is analogous to *Carlos* error.

However, as the Supreme Court pointed out in *People* v. *Garcia, supra,* 36 Cal.3d at pages 554-555, despite the general rule that *Carlos* error is reversible per se, reversal is not required if one of four narrowly drawn exceptions apply. Since this appeal follows a guilty plea, it is to the transcript of the change of plea proceeding this court must look to determine whether the record contains an adequate factual basis for defendant's admission of the special circumstances and whether such a factual basis, if present, is adequate to bring the particular circumstances of this case within one of those exceptions.[5]

---

[5]Section 1192.5 provides in pertinent part, "The court shall also cause an inquiry to be made of the defendant to satisfy itself that the plea is freely and voluntarily made, and that

Our review of the transcript of defendant's change of plea persuades us a factual basis existed sufficient to sustain defendant's admission of both special circumstances in light of the *People* v. *Carlos, supra,* requirement that a killing in the course of a felony be proven intentional. Prior to reaching this factual basis, however, we note defendant made numerous pretrial challenges, procedural and substantive, both to the charge of first degree murder itself and to the special circumstances as alleged in the information. These various challenges, which were all unsuccessful, focused in large part on the mental element of the homicide, i.e., the intentional nature of the killing. Of particular interest is the motion defendant filed on January 17, 1983, to "bar prosecution under felony murder rule." The motion was brief: "This motion will be based on the grounds that the continued validity of the felony murder rule is before the California Supreme Court in *People v. Dillon,* Crim. 21964, and *People v. Caldwell and Washington,* Crim. 22557, and on the grounds therein stated to the Supreme Court as a basis for declaring that the felony murder [rule] is unconstitutional and invalid." The trial court denied the motion.

Of course the Supreme Court's decision in *People* v. *Dillon* (1983) 34 Cal.3d 441 [194 Cal.Rptr. 390, 668 P.2d 697] was adverse to the position asserted by defendant in his motion; the Supreme Court upheld the continuing validity of the felony-murder rule in California whether or not the defendant intended to commit the homicide. It is only when the murder is the basis for a special circumstance, which could result in the death penalty or imprisonment for life without the possibility of parole, that the state is put to the burden of proving the killing was an intentional one. However, accepting the premise that the various pretrial motions made by defendant in the instant case anticipated the *Carlos* decision and also accepting the premise that defendant thus established his concern with intent to kill as a necessary element in finding true any special circumstance under section 190.2, subdivision (a)(17), we nonetheless believe the record here establishes an ample factual basis for defendant's admission of those special circumstances.

When the trial court stated, "I assume that counsel are willing to stipulate that there is indeed a factual basis for this plea, both in the police reports and in the transcript of the preliminary examination?" defense counsel responded: "No, I can't—I will stipulate there's a factual basis for the plea on what the evidence would be. The preliminary examination, I disagree with because of our 995 motions. I will stipulate primarily that this Court

---

there is a factual basis for such plea." In *People* v. *Tigner* (1982) 133 Cal.App.3d 430, 435 [184 Cal.Rptr. 61], this court held, "that a mere recitation by the court concluding 'There's a factual basis' without developing the factual basis *on the record* is not sufficient to meet the requirements of Penal Code section 1192.5."

has heard a motion to suppress the concession [*sic*], and that was denied, and indeed that coming in evidence would be more than enough factual basis for this plea." The prosecutor concurred in defense counsel's assessment of the evidentiary weight of defendant's confession, which was summarized above in the statement of the facts. It indicates the advance planning that went into the killing of Edwin Buck and defendant's actions in furtherance of that plan. Moreover it suggests nothing whatsoever which would vitiate the intentional nature of defendant's actions. There was no suggestion of any duress, any alcohol or drug usage, or any intent to assault but not to kill.

When taking the actual admissions of the special circumstances, the prosecutor reviewed in detail the planning that had gone into the offenses, specifically to establish that defendant's intent to "assault" Buck was formulated prior to any taking of personal property and that this intent was in furtherance of defendant's larcenous purpose. While the prosecutor consistently used the word "assault," defendant's own confession established that this assault was by means of a knife and a hammer. He admitted leaning through the passenger window of the victim's vehicle and, without comment, stabbing him in the chest and then entering the car and continuing to stab the victim until his codefendant Robert handed him a hammer. At that point defendant beat the victim in the head with the hammer until the victim died. Moreover, defendant admitted to some misgivings about the "assault" prior to its occurrence but told the police he and Robert discussed their plans, which defendant confessed were to *kill* Buck, and decided to go ahead.[6]

Finally, when defendant's plea was actually taken, the prosecutor said: "Mr. Camenisch, I'm going to ask you, then, it is charged in the first count of the Information that you did on or about the 17th day of July, 1981, at and in the said County of Kern, State of California, before the filing of this Information, that you did willfully, unlawfully, feloniously and with malice aforethought murder Edwin A. Buck, a human being, in violation of Section 187 of the Penal Code. Now that's what you're charged with. And when I ask you whether or not you plead guilty to that, I'm going to ask you if you plead guilty to that in the first degree, murder in the first degree. Now do you understand that?

---

[6]Section 240 defines assault as "an unlawful *attempt*, coupled with a present ability, to commit a violent injury on the person of another." (Italics added.) Webster's New World Dictionary (2d college ed. 1982) page 83, lists as the first definition of assault "[a] violent attack, *either* physical or verbal." Given the admitted facts of the instant case, it strains credulity to believe the prosecutor intended, by using the word "assault," to imply defendant and Robert planned nothing more than a threatened or attempted injury to persuade Buck to part with his property.

"A. Yes, I do.

"Q. How do you plead, then, Mr. Camenisch, to that charge that you did, in fact, murder Edwin A. Buck, a human being, in violation of Penal Code Section 187, and the degree being set as murder in the first degree? Do you plead guilty or not guilty?

"A. Guilty." Defendant's plea was to a charge that he killed Edwin Buck willfully and with malice aforethought; there was no reference at all to a negligent or accidental killing occurring during the course of the felony.[7]

■ It is clear that a defendant must understand the nature of the charge against him prior to acceptance of a guilty plea. (See generally Witkin, Cal. Criminal Procedure (1983 supp., pt. 1) Proceedings Before Trial, § 255G, p. 281.) However, in light of all the circumstances summarized above, this case is readily distinguishable from *Henderson* v. *Morgan, supra,* 426 U.S. 637 [49 L.Ed.2d 108]. In *Henderson,* the defendant was charged with first degree murder and entered a plea of guilty to second degree murder. The defendant had been fired and, during the nighttime, entered the home of his employer armed with a knife, "intending to collect his earned wages before leaving; she awoke, began to scream, and he stabbed her." (*Id.,* at p. 641 [49 L.Ed.2d at p. 112].) Evidence established the victim "didn't stop screaming and then he used the knife many times." (*Id.,* at p. 641, fn. 8 [49 L.Ed.2d at p. 112].) At the time defendant entered his plea to second degree murder, "[t]here was no discussion of the elements of the offense of second-degree murder, no indication that the nature of the offense had ever been discussed with respondent, and no reference of any kind to the requirement of intent to cause the death of the victim." (*Id.,* at pp. 642-643 [49 L.Ed.2d at p. 113].)

Noting that a guilty plea cannot support a judgment unless it is voluntary in the constitutional sense, the court stated, "[a]nd clearly the plea could not be voluntary in the sense that it constituted an intelligent admission that he committed the offense unless the defendant received 'real notice of the

---

[7]Section 7, subdivision 1, provides, "The word 'willfully,' when applied to the intent with which an act is done or omitted, implies simply a purpose or willingness to commit the act, or make the omission referred to. It does not require any intent to violate law, or to injure another, or to acquire any advantage." Section 7 applies to all sections of the Penal Code, encompassing numerous offenses requiring differing degrees of mens rea. "Willful" only appears in those sections of the Penal Code dealing with homicide in connection with first degree murder, i.e., a killing which is "willful, deliberate, and premeditated" (§ 189), killings which by definition are intentional. However, even affording defendant the benefit of the more general section 7 definition, in admitting he "willfully" murdered Buck, defendant necessarily admitted he had a purpose or willingness to stab Buck repeatedly and to bludgeon Buck with a hammer. These particular "willful" actions were necessarily intended to injure another; any argument to the contrary flies in the face of logic and common sense.

true nature of the charge against him, the first and most universally recognized requirement of due process.' [Citation omitted.]" (*Id.*, at p. 645 [49 L.Ed.2d at p. 114].) Although the evidence would have been sufficient, if presented to a jury, to sustain a conviction of second degree murder based on the objective evidence summarized above, the court observed it was "also true that a jury would not have been required to draw that inference. The jury would have been entitled to accept defense counsel's appraisal of the incident as involving only manslaughter in the first degree. Therefore, an admission by respondent that he killed Mrs. Francisco does not necessarily also admit that he was guilty of second degree murder." (*Id.*, at pp. 645-646 [49 L.Ed.2d at p. 115], fns. omitted.) The court went on to state: "There is nothing in this record that can serve as a substitute for either a finding after trial, *or a voluntary admission,* that respondent had the requisite intent. Defense counsel did not purport to stipulate to that fact; they did not explain to him that his plea would be an admission of that fact; and he made no factual statement or admission necessarily implying that he had such intent. In these circumstances it is impossible to conclude that his plea to the unexplained charge of second-degree murder was voluntary." (*Id.*, at p. 646 [49 L.Ed.2d at p. 115], italics added.) The court concluded that prosecution fears that their decision would result in countless collateral attacks on otherwise valid guilty pleas were groundless. The court noted the *unique* circumstances of the case before it since the trial judge found "as a fact that the element of intent was not explained to respondent. Moreover, respondent's unusually low mental capacity provides a reasonable explanation for counsel's oversight; it also forecloses the conclusion that the error was harmless beyond a reasonable doubt, for it lends at least a modicum of credibility to defense counsel's appraisal of the homicide as a manslaughter rather than a murder." (*Id.*, at p. 647 [49 L.Ed.2d at p. 116].)[8]

Given defendant's relative youth (he was 18 at the time of the killing) and the severity of the sentence which was imposed, were there any doubt at all in this case concerning the intentional nature of defendant's actions, such doubt should be resolved in favor of granting defendant the relief he seeks. ■ However, the record leaves no doubt that defendant killed Buck intentionally. We therefore conclude that there was an adequate factual basis evident in the record to sustain not only defendant's admission of the special circumstance but to sustain that admission in light of full retroactive application of the holding in *Carlos* v. *Superior Court, supra,* 35 Cal.3d 131. The situation in the instant case is analogous to the second exception recognized by the Supreme Court in *People* v. *Garcia, supra,* 36 Cal.3d 539,

---

[8]We find a similar lack of factual support for a guilty plea, when the defendant was not advised that intent was a necessary element of the offense, in the record summarized in *Galeo* v. *State* (1911) 107 Me. 474 [78 A. 867]. This absence of *any* evidence of the defendant's intent distinguishes *Galeo* from the case before this court.

554, to wit: " 'if the defendant conceded the issue of intent.' [Citation omitted.]" Defendant's confession, the admissibility of which triggered his plea of guilty and which itself constituted the factual basis for his plea makes precisely that concession, i.e., the killing of Edwin A. Buck was intentional.

Finally we consider the significance, if any, of the recent opinion of the Second District Court of Appeal in *People* v. *Powers, supra,* 151 Cal.App.3d 905. In *Powers,* the defendant had been charged, among other counts, with burglary, robbery, and murder. So-called "felony murder" special circumstances were also alleged. In defendant's first trial, the jury convicted him of burglary and robbery but deadlocked on the murder charge. Prior to retrial and in accord with a plea bargain, defendant pleaded guilty to first degree murder and the special circumstance allegations were stricken. Defendant was sentenced to 25 years to life in prison. On appeal the defendant contended that the trial court had erred in failing to strike the special circumstances on the defendant's motion since the evidence produced at trial failed to show the defendant intended to kill or intentionally aided and abetted the murder. Therefore, defendant contended his plea to first degree murder was not voluntary in that it was induced by the felony-murder special circumstance allegation, subsequently altered by the opinion in *Carlos* v. *Superior Court.*

The *Powers* court rejected the defendant's contention, relying on a line of United States Supreme Court cases (including *Brady* v. *United States* (1970) 397 U.S. 742 [25 L.Ed.2d 747, 90 S.Ct. 1463]; *McMann* v. *Richardson* (1970) 397 U.S. 759 [25 L.Ed.2d 763, 90 S.Ct. 1441]; and *Parker* v. *North Carolina* (1970) 397 U.S. 790 [25 L.Ed.2d 785, 90 S.Ct. 1458]) and two California cases (*People* v. *Barton* (1971) 19 Cal.App.3d 990 [97 Cal.Rptr. 329] and *People* v. *Johnson* (1972) 28 Cal.App.3d 653 [104 Cal.Rptr. 807]). In *Powers,* as in the cases relied upon, the court declined to afford the defendants who had entered valid guilty pleas the benefit of subsequent changes in the law, in light of which those defendants might not have pleaded guilty. The *Powers* court relied heavily upon the rationale of Justice Kaus in *People* v. *Barton, supra,* specifically:

" 'The fact that Brady did not anticipate *United States* v. *Jackson* [(1968) 390 U.S. 570 (20 L.Ed.2d 138, 88 S.Ct. 1209)] does not impugn the truth or reliability of his plea. We find no requirement in the Constitution that a defendant must be permitted to disown his solemn admissions in open court that he committed the act with which he is charged simply because it later develops that the State would have had a weaker case than the defendant had thought or that the maximum penalty then assumed applicable has been held inapplicable in subsequent judicial decisions.' [Citation omitted.]

" 'It is no denigration of the right to trial to hold that when the defendant waives his state court remedies and admits his guilt, he does so under the law then existing; further, he assumes the risk of ordinary error in either his or his attorney's assessment of the law and facts. Although he might have pleaded differently had later decided cases then been the law, he is bound by his plea and his conviction unless he can allege and prove serious derelictions on the part of counsel sufficient to show that his plea was not, after all, a knowing and intelligent act.' [Citation omitted.]" *(People* v. *Barton, supra,* 19 Cal.App.3d at pp. 994-995.)

Since *Powers* was decided prior to the decision in *People* v. *Garcia, supra,* giving retroactive effect to the opinion in *Carlos* v. *Superior Court, supra,* it could be argued that the decision in *People* v. *Powers, supra,* can have no significance in the instant case. However, language from *McMann* v. *Richardson, supra,* on which the courts in *Powers* and *Barton* relied, is instructive:

"We are unimpressed with the argument that because the decision in *Jackson* [*Jackson* v. *Denno* (1964) 378 U.S. 368] has been applied retroactively to defendants who had previously gone to trial, the defendant whose confession allegedly caused him to plead guilty prior to *Jackson* is also entitled to a hearing on the voluntariness of his confession and to a trial if his admissions are held to have been coerced. A conviction after trial in which a coerced confession is introduced rests in part on the coerced confession, a constitutionally unacceptable basis for conviction. It is that conviction and the confession on which it rests that the defendant later attacks in collateral proceedings. The defendant who pleads guilty is in a different posture. He is convicted on his counseled admission in open court that he committed the crime charged against him. The prior confession is not the basis for the judgment, has never been offered in evidence at a trial, and may never be offered in evidence. Whether or not the advice the defendant received in the pre-*Jackson* era would have been different had *Jackson* then been the law has no bearing on the accuracy of the defendant's admission that he committed the crime.

"What is at stake in this phase of the case is not the integrity of the state convictions obtained on guilty pleas, but whether, years later, defendants must be permitted to withdraw their pleas, which were perfectly valid when made, and be given another choice between admitting their guilt and putting the State to its proof." *(McMann* v. *Richardson, supra,* 397 U.S. at p. 773 [25 L.Ed.2d at pp. 773-774].)

In *Powers,* the court concluded, "[t]herefore, the fact that California Supreme Court decisions subsequent to appellant's guilty plea have established

that a felony murder special circumstance allegation requires an intent to kill or aid in a killing [citation omitted] . . . does not affect appellant's voluntary guilty plea nor the sentence which has been lawfully imposed on him." (*People* v. *Powers, supra,* 151 Cal.App.3d at p. 917.) ▮ Similarly, based on the rationale of *McMann* v. *Richardson, supra,* 397 U.S. 759, retroactive application of the decision in *Carlos* v. *Superior Court, supra,* 35 Cal.3d 131, to defendant's case does not require under these particular facts that defendant be given another opportunity to reconsider his plea and, possibly, put the state to its proof. The fact that the Supreme Court in *Carlos* determined that a "felony murder" special circumstance requires proof of an intent to kill has no bearing on the accuracy of defendant's admission establishing that he, in fact, had such intent when he assaulted and murdered Edwin Buck. Since the California Supreme Court has not applied an absolute reversible error per se rule even when an improperly instructed jury has found true such a special circumstance, and since one of the exceptions recognized in *People* v. *Garcia, supra,* 36 Cal.3d 539, i.e., defendant's concession of intent, is apparent in this case, we are not persuaded that defendant is entitled to relief.

The judgment is affirmed.

Franson, Acting P. J., and Martin, J., concurred.

Appellant's petition for review by the Supreme Court was denied June 20, 1985.