Filed 10/3/16  P. v. Prieto CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> PAUL RICHARD PRIETO, <br><br> Defendant and Appellant. | F068805 <br><br> (Super. Ct. No. F10500245) <br><br><br> **OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Fresno County.  Arlan L. Harrell, Judge.

Seymour I. Amster for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Kathleen A. McKenna and William K. Kim, for Plaintiff and Respondent.

-ooOoo-

Paul Richard Prieto (defendant) stands convicted, following a jury trial, of armed robbery of Manuel Uribe and Jesus Maria Moreno (Pen. Code,[1] §§ 211, 12022.53, subd. (b); counts 1 & 3, respectively), attempted armed robbery of Josue Raul Gutierrez and Pedro Contreras (§§ 211, 664, 12022.53, subd. (b); counts 2 & 4, respectively), and possession of a firearm by a felon (former § 12021, subd. (a)(1); count 5). Following a bifurcated court trial, he was found to have suffered two prior serious felony convictions (§ 667, subd. (a)(1)) that were also strikes (§§ 667, subds. (b)-(i), 1170.12, subds. (a)-(d)), and to have served three prior prison terms (§ 667.5, subd. (b)). He was sentenced to an aggregate term of 40 years plus 50 years to life in prison, and ordered to pay various fees, fines, and assessments.

We affirm. We hold: (1) Any error in allowing the jury to learn the facts of some of defendant's prior convictions was harmless; (2) The trial court did not err by giving CALCRIM No. 225 instead of CALCRIM No. 224; and (3) The fact the firearm use enhancements were found "proven" instead of "true" does not entitle defendant to have them stricken.

## FACTS

### I

#### PROSECUTION EVIDENCE

On the night of June 8, 2010, Pedro Contreras, Jesus Moreno, Manuel Uribe, Josue Gutierrez, Juan Trujillo, and a couple of Trujillo's friends were at a barbecue at a home in Parlier. They then decided to walk to a party at another friend's house.

As they were walking along Tuolumne Street, a silver Dodge Magnum drove slowly past on the opposite side of the road.[2] The driver looked at them, then made a

---

[1] Further statutory references are to the Penal Code unless otherwise stated.

[2] The car caught Trujillo's attention because it surprisingly was the only vehicle around and was not from Parlier.

2.

U-turn at the intersection of Tuolumne and Madsen and came back toward them. The car stopped right next to them, underneath a street light. The driver — whom Contreras, Uribe, Moreno, and Trujillo identified at trial as defendant — then got out of the car. The passenger remained in the car throughout the incident.[3] At some point, either as he exited the vehicle or as he started talking to the group, defendant pulled a small- to medium-sized chrome semiautomatic pistol and pointed it at the group.

Defendant casually walked up to Uribe, pushed him back with his right hand, and told the group to empty their pockets and put whatever valuables they had on the ground. Contreras was carrying a phone and his room key. He threw the phone in some bushes and put the key on the sidewalk in front of him.[4] Moreno had a wallet and a phone. He threw his wallet behind himself and handed the phone to defendant, who had the gun pointed at Moreno's chest. Defendant then picked up the wallet. Gutierrez threw his new cell phone in some bushes and put his keys on the ground. Trujillo had a phone and a wallet, and put them on the ground like defendant ordered.

Defendant went to each one in the group and made sure they had emptied out their pockets. He then returned to Uribe and told him to take off his chain. Uribe said it was not a chain, but rather his dog tags. Defendant pointed the gun at Uribe's head and asked him if he was "a mutt," which Uribe believed had gang connotations. Uribe said no, he was in the military. Uribe put his wallet and cell phone on the ground as defendant

---

[3]    Contreras had never seen either man before. He was not able to observe the race of the passenger, but could tell he had long hair in a ponytail. Uribe had not seen defendant before, and did not know if he knew the passenger, because he was unable to see him very well. Gutierrez had not seen either man before. Moreno had not seen defendant before that day. He recognized the passenger as someone named Damian, whose nickname was "Gee," with whom he had gone to school, however. Trujillo did not know the passenger personally or know his name, but had known who he was since high school and had seen in him Parlier. He had never before seen the driver. During the incident, the passenger stayed in the car, drinking a beer and laughing.

[4]    The key was still there at the end of the incident.

directed, then defendant told him to take off his boots. Uribe asked if he was serious and defendant said he was, so Uribe did as he was told.

When defendant was finished, he told them all to turn around. All except Moreno obeyed.[5] Defendant picked up everyone's belongings and left in the car. The group turned back around and tried to get the car's license plate number. Gutierrez was able to get the first four letters and numbers. The group then went to Trujillo's house, which was about five minutes away, and used Gutierrez's phone — which Gutierrez had retrieved after the car left — to call the police.

Parlier Police Officer Jimenez was dispatched at approximately 1:50 a.m. The radio call included the information that a robbery had occurred 10 to 15 minutes earlier, and descriptions of the suspect, the vehicle, and the firearm. Jimenez contacted subjects who reported they had just been robbed, then broadcast an alert for the suspect vehicle, along with a partial license plate number that one of the victims provided. He took statements from those who were present, including several persons who testified at trial. Contreras told him the person with the gun had a tattoo on the right side of his neck.[6]

Around 3:00 a.m., Parlier Police Sergeant Wallace observed the vehicle parked in a residential area about half a mile from where Jimenez contacted the victims, with two individuals standing by the driver's door and a third on the passenger side. One — Manuel Felix — was trying to unlock the car with a hanger. The other individual by the driver's door was holding a light so Felix could see. They said they had locked their keys in the car. The one on the passenger side matched the description of the armed robbery suspect, including the tattoo on his neck and clothing, so Wallace drew his weapon and

---

[5] Moreno remained facing defendant and the car, in order to be able to identify them.

[6] Uribe also saw a tattoo on the right side of defendant's neck, although he did not get a clear view of what it was. Gutierrez saw a tattoo on defendant's neck, although he could not recall which side. Trujillo saw a tattoo of what looked like an Asian letter on defendant's neck.

ordered the three to raise their hands and not move. While he was radioing for assistance, the suspect — defendant — kept lowering his hands and going toward his waistband. Wallace called him back to the rear of the vehicle in order to see his whole body, as Wallace was concerned he had a weapon.[7]

Jimenez and Officer Rodriguez arrived to assist, and the three individuals were detained. When Wallace looked inside the Dodge Magnum, he saw a pair of boots on the driver's side backseat, an empty gun holster on the front passenger's side floorboard, and an identification card for Romel Damian Vasquez Medina, with whom Wallace and Jimenez were familiar, and who was known as "Gee." The identification card was on the front passenger's side of the Dodge.[8]

Jimenez subsequently transported four of the victims to the location at which the silver car had been found. Although the spotlight from Jimenez's vehicle was trained on defendant, the other two who had been detained were also illuminated. All those in Jimenez's car identified defendant as the person who took their belongings. These identifications were made within about an hour and a half of when the robbery was reported.

Based on the positive identifications, defendant was taken into custody, placed in the back of Jimenez's patrol vehicle by himself, and transported to the police department. As per departmental policy, Jimenez physically and visually checked the patrol vehicle for contraband, weapons, or property left behind, before defendant was placed in the car. Nothing of note was found in the vehicle or in defendant's pockets. Defendant was fingerprinted, then Jimenez transported him to the Fresno County Jail. During the drive, Jimenez noticed defendant kicking the floorboard and underneath the seat. After

---

**7**     None was found.

**8**     Jimenez subsequently prepared a photographic lineup that included a picture of Medina, but none of defendant. Moreno identified Medina's photograph. Medina was not the person with the gun.

removing defendant from the patrol vehicle, Jimenez found a credit card and a bank card where defendant's feet had been. One had Uribe's name on it and the other bore Moreno's name.

## II

### DEFENSE EVIDENCE

Defendant testified that Medina lived in Dinuba in June 2010. Defendant first met him in May of that year, when defendant began dating Medina's sister, with whom Medina lived. Medina was about five feet 10 inches tall, with faded hair and bald on the sides of his head. He had four dots tattooed on his left wrist and a small cobweb tattooed on the left side of his neck. He also had lips tattooed on his neck, and XIV on the back of his neck.[9]

On June 8, 2010, defendant lived in Dinuba. He got off work at 3:00 p.m. that day, then attended class at San Joaquin Valley College at 5:30 p.m. In April 2005, defendant lost two fingers and part of a third on his right hand, when his hand was pulled into a swather — a machine that cuts alfalfa — that he drove. Because he lost a lot of mobility in his right arm, he was receiving job retraining.

Defendant's class was scheduled to last until approximately 10:15 p.m. He left at about 8:30 or 8:45, however, because he received a text from Medina's sister, saying she was at a graduation party in Parlier and asking him to meet her there. Because defendant

---

[9]    In rebuttal, Jimenez testified that on November 25, 2013, he contacted Medina at the Fresno County Jail and photographed Medina's neck. Jimenez, who had had contact with Medina aside from this case, estimated Medina was about six feet one to two inches tall, and had not changed much in the past three years. His head was shaven, as it had been the entire time Jimenez had known him. At no time had Jimenez known him to have a faded hairstyle. Medina had no tattoos on the back of his head and neck, and none on the right side of his neck as opposed to the collarbone. There were no tattoos visible on the left side of his neck when he was wearing a T-shirt. He had a tattoo of lips below the shirt line on the right chest, as well as other tattoos further down his chest. These tattoos were consistent with how Jimenez recalled Medina's appearance in the summer of 2010.

was not familiar with Parlier, she gave him directions. He found the residence, but lack of parking meant he had to park one or two houses away.

As defendant walked toward the house where the party was being held, he came upon Medina and two individuals he did not know. They were standing outside about a house away from where defendant was supposed to be. Medina asked for a ride so he could buy more beer for the party. Although defendant agreed, he did so hesitantly, because Medina was not the type of person with whom defendant normally associated. They had different viewpoints on how they lived their lifestyles.

Medina got into defendant's silver Dodge Magnum and gave him directions to a store that was three or four minutes away. As defendant was parking, he noticed Medina was on the phone, texting. Medina went into the store and bought some beer. When he came back out, defendant, who had left the car running, put it in reverse, but Medina asked him to wait for someone. Defendant waited a few minutes, but no one showed up. Meanwhile, Medina's sister was "blowing up" defendant's phone, wanting to know where he was. Defendant told Medina he had to go.

They left the store, with defendant still driving and Medina was still in the front passenger seat. Medina gave defendant directions back to the party, but they took a new route this time. As they were driving at a normal speed down what defendant learned from testimony at trial was Tuolumne, Medina tapped defendant's shoulder and pointed with his thumb toward something off to defendant's left. Defendant turned to look, and saw four individuals he now knew to be Contreras, Gutierrez, Moreno, and Uribe.[10] About 50 yards beyond the group, Medina told defendant to turn around. Defendant made a U-turn and kept driving. When the group was close to the car, Medina tapped defendant's shoulder and motioned him to slow down.

---

[10] According to defendant, only those four individuals were present.

Defendant stopped the car about 15 feet in front of the group. He expected Medina to roll down the window and say something to the individuals. Instead, Medina got out of the car, walked up to the group, and began having a "pretty heated" discussion with Uribe. When it appeared to defendant like the other three were ganging up on Medina, who did not have a gun in his hands, defendant got out of the car. As he did so, his cell phone, which had been on his lap, went flying. Defendant went to retrieve it and examined it to make sure it was not scratched. He then walked to the front of the car, at which time he realized Medina was pulling out a gun.[11] Seeing it, defendant hesitated in front of his car. The debate between Medina and Uribe still seemed heated, even with the gun out, although defendant did not know what was being said. No one else had a gun.

Defendant yelled for Medina. He saw Medina point the gun at the chest areas of those in the group, and at eye level with respect to Uribe. Contreras and Moreno started backing up, and defendant turned around and went back to the driver's door. He yelled for Medina again. By this time, Uribe was taking off his boots. Defendant got into the driver's seat and saw Medina walking back to the car with boots and the gun in his hand. He saw something placed inside a boot, but did not know what it was.

Medina got into the car, and defendant drove off. Medina gave him directions back to the graduation party. It was defendant's intention to drop Medina off there. During the drive, defendant asked Medina to throw out the boots. Medina refused.

When they arrived at the location of the party, Medina asked for a ride to a friend's house down the street, where another party was being held. Although defendant had planned to pick up Medina's sister and leave, he felt he did not have many options. He put his keys in the car, then called Medina's sister and asked if she could give

---

[11] This was the first defendant knew Medina had a gun with him. Defendant realized he probably should have driven off when he saw the gun, but everything happened in a matter of 15 to 20 seconds.

defendant a ride. Defendant did not want to take Medina anywhere else that night. Defendant planned to return later for the vehicle.

Defendant meant to lock all the car doors but one, so Medina could not get in but defendant could leave later in the car. The vehicle had automatic locks, however, and he accidentally locked his keys in the vehicle. Without defendant telling him to, Medina asked for help from two individuals at the party whom he knew. They produced a coat hanger from the back of their pickup and proceeded to try to unlock the door. Medina still had the gun in his pocket. Defendant never had possession of the gun.

Sometime later, a police cruiser arrived. Defendant, who had been talking to Medina's sister, started walking toward it, because he thought the officer would believe someone was trying to break into the car. Defendant was patted down "pretty good" and his pockets were checked, then he was placed into Wallace's car. He was subsequently taken out and a spotlight was put on him. He was then put back into Wallace's car, then Jimenez returned, took him out of Wallace's car, thoroughly patted him down again, and put him in the back of Jimenez's vehicle. Defendant did not see any sort of bank cards in the backseat of the vehicle and had no such thing in his possession.

Jimenez drove defendant to the Parlier Police Department. Defendant was in the backseat. When they arrived, which was about 1:30 a.m., Jimenez "open[ed] the backseat" and they had a conversation. Defendant was then searched, fingerprinted, and booked. He was placed in a holding cell for four to five hours. Around 6:30 or 7:00 a.m., defendant was transported to the Fresno County Jail. Jimenez again drove. Upon their arrival, Jimenez did not look into where defendant was seated in the vehicle or locate anything. Defendant had nothing in his possession belonging to the people who were robbed. He did not rob anyone on June 8, 2010.

9.

# DISCUSSION

## I. ANY ERROR IN PERMITTING JURORS TO LEARN FACTS UNDERLYING DEFENDANT'S PRIOR CONVICTIONS WAS HARMLESS.

### A. Background

The People moved, in limine, to be permitted to use defendant's two prior robbery convictions for impeachment purposes. Defendant represented he had three such convictions, and he moved to exclude them pursuant to Evidence Code sections 352 and 1101, as well as for purposes of impeachment. Following argument, the court ruled the convictions could be used for impeachment purposes, but were to be referred to as felony theft convictions, without mention of any firearm involvement.

Based on defense counsel's request to have Medina's criminal history admitted into evidence, the People asked to be permitted to use evidence of defendant's prior convictions to prove identity, as well as common plan or scheme, pursuant to Evidence Code section 1101, subdivision (b). The trial court reiterated its previous ruling, although it did permit the People to use, for impeachment, a prior conviction for felon in possession of a firearm and brandishing, as long as it was referred to as a felony weapons offense. Defense counsel recognized that if defendant testified he could not have handled a gun in 2010 due to his hand injury, the prosecutor might seek to use the latter conviction in rebuttal. Counsel did not dispute the prosecutor's statement that in such a case, Evidence Code section 1101, subdivision (b) would not be implicated. The court reserved ruling on that use of the conviction.

Contreras subsequently testified the perpetrator was using his right hand when he pointed the gun at Uribe's head, and he had no difficulty holding the gun. Uribe testified he saw the gun in the perpetrator's right hand. He got a good look at the hand, but did not notice anything unusual about it. Moreno testified the person was holding the gun in his right hand. He could not recall if the person had any difficulty holding the gun, or if there was anything unusual about the hand. Gutierrez testified he believed the perpetrator

10.

was holding the gun in his right hand without difficulty. He did not notice anything unusual about the hand holding the gun. The gun was "medium-sized, medium-small." Trujillo testified the person held the gun in his right hand. The gun was small, like a .22. Trujillo did not get a good look at the man's right hand, and did not notice anything unusual about it.

Defense counsel began his examination of defendant by eliciting defendant was convicted of a firearm-related offense on January 18, 2006; a theft offense on June 22, 2006; and a theft offense on August 23, 2006. Counsel then had defendant show the jury his right hand. Defendant explained he lost the fourth and fifth fingers, and a portion of the middle finger, on his right hand in a work-related accident in April 2005. When defense counsel asked him about the class he was attending on the night of the events in this case and whether it was part of his rehabilitation from the injury, defendant responded: "It was. I was granted some financial money to retrain me in another trade, since I couldn't — I lost a lot of mobility in my right arm. I couldn't do things I could do prior. I couldn't find jobs that would allow me to do the job well, or I couldn't get hired by employers because I couldn't do jobs, so I went to college to get retrained in something that might only — that only takes one hand, or limited hand-training."

The prosecutor subsequently argued, outside the jury's presence, that although defendant was not specifically asked if he could hold a gun, his showing his hand to the jury implied he could not. Accordingly, she requested that she be allowed to ask him, for impeachment purposes, if his prior weapon offense involved him pleading to having a gun and brandishing it, since the offense postdated his injury. Defense counsel opposed the request, arguing he never asked if, and defendant never stated, defendant was not capable of wielding a gun. Rather, the defense brought up the injury to the hand solely for identification purposes, in light of the fact none of the victims noticed anything unusual about the perpetrator's right hand. The trial court found "problematic" defendant's having volunteered that he had difficulty with the use of his right hand since

11.

the injury.  The prosecutor also represented that one of defendant's robbery convictions involved defendant pulling a gun from his waistband, again after the date of his injury, and so was further evidence he was capable of holding a gun.

The court ruled the prosecutor could ask defendant questions concerning whether the injury would impact his ability to manipulate a firearm, but could not go into the details of the prior convictions.  It noted, however, that much depended on how defendant answered the questions, and it invited counsel to reraise the issue outside the jury's presence if counsel believed there was "some inaccuracy taking place."

The following took place during the prosecutor's cross-examination of defendant:

"Q  You started off your testimony . . . with showing your right hand, Mr. Prieto.  Are you right-handed?

"A  I was.

"Q  And in 2010, you were right-handed?

"A  No.  I was right-handed up until the point I lost my fingers.

"Q  Is it your testimony, Mr. Prieto, that as of June 8th of 2010, your right hand was not your dominant hand?  [¶] . . . [¶]

"A  Yeah.  Yes.

"Q  Can you still write with your right hand?

"A  I can't.

"Q  This injury was in 2005, right, April?

"A  It was.

"Q  After April of 2005, could you hold a gun with your right hand?

"[DEFENSE COUNSEL]:  Objection, relevance, beyond the scope and improper cross-examination.

"THE COURT:  Overruled.  You can answer.

"THE WITNESS:  I can't.  I can't make a fist with my right hand.

12.

"[PROSECUTOR]: Q I'm not asking if you can make a fist, sir. Can you hold a gun with your right hand?

"A I cannot grip anything. No, I cannot hold a firearm with my right hand."

The prosecutor then asked to approach, and a sidebar discussion was held. This ensued:

"Q [by the prosecutor] Mr. Prieto, I want to be very clear on the dates. On June 8th of 2010, approximately five years after sustaining your work injury on your right hand, could you hold a firearm?

"A It is medically impossible for me to hold a firearm. [¶] . . . [¶]

"[PROSECUTOR]: Q Is that a no?

"A I did not, no.

"Q In fact, is it your testimony you are not capable of holding a firearm, correct?

"A I haven't actually tried. But I know I can't. I can't hold things in my right hand."

A further sidebar discussion was held at the court's request. Over defense counsel's objection on the grounds stated earlier, the prosecutor was permitted to confirm defendant stated it was medically impossible for him to hold a firearm on June 8, 2010, and this impossibility arose at the time of the work injury to his hand, i.e., April 2005. This ensued:

"Q [by the prosecutor] And it's your testimony that since that date, you would not be able to hold a firearm, is that —

"A In my right hand. I would not be able to hold a firearm in my right hand. Or anything in that nature. A pitcher of water. These Kleenexes.

"Q And up until 2005, April 2005, you were right-handed, correct?

"A Yes.

13.

"Q How about holding a firearm in your left hand? Would that be possible?

"[DEFENSE COUNSEL]: Objection. Relevance, beyond the scope.

"THE COURT: Overruled. You can answer, sir.

"THE WITNESS: Sure, anybody with a left hand could hold a firearm, I guess. [¶] . . . [¶]

"Q Have you in fact held a firearm since April of 2005?

"A With my left hand or with my right hand?

"Q At all.

"A Yes, I have.

"Q And how quickly did you become able to hold a firearm with your left hand after that injury?

"A On — I tried going dove hunting with a family member and it didn't work out too well. Wouldn't be able — I wouldn't be able to grip — I was not able to grip the rifle. So once I discharged it, it flew out of my hand.

"Q Let me be clear, Mr. Prieto, is it your testimony that you can or you cannot hold a firearm with your left hand after April of 2005?

"A I could. I guess I could hold a firearm in my left hand.

"Q But you just testified that you were unsuccessful in doing so, didn't you?

"[DEFENSE COUNSEL]: Objection, misstates testimony.

"THE COURT: Overruled. You can answer, sir.

"THE WITNESS: I said when I discharged it, I was not able to hold it with my right hand, so it flew out.

"[PROSECUTOR]: Q And I want to make sure, I'm not asking if you can discharge a firearm, I'm asking if you can hold a firearm. Can you hold a firearm in your left hand?

"A Yes, sure.

14.

"Q Can you hold a firearm in your right hand as of June, 2010? Not discharge, but hold. [¶] . . . [¶]

"A No. I can't hold a —

"Q Isn't it true, Mr. Prieto, that in 2005, you were convicted of a felony weapons offense?

"A Yes.

"Q Let me be specific. That was a date of violation in September of 2005. So after the date of your hand injury.

"A Yes.

"Q And that weapons offense was a gun?

"A Yes, it was.

"Q And you were convicted of that, correct? Brandishing a firearm?

"A Yes, I pled guilty.

"Q And you were convicted of being a prohibited person with a firearm, correct? [¶] . . . [¶]

"A I don't remember that ever. But —

"Q When you used a gun on September 30th of 2005 that resulted in the conviction we have just spoken of, what hand were you holding the gun in?

"A It was a — would you like me to elaborate on the incident?

"Q No. I would just like to know, left hand or right hand, sir?

"A It was my left hand, resting on my right shoulder. Well, elbow.

"Q In 2006, Mr. Prieto, you were convicted of a felony theft offense, correct?

"A Correct.

"Q And that, again, would be after the date where you lost the two fingers on your right hand?

15.

"A Yes.

"Q And that, too, involved the use of a firearm, did it not?

"A A BB gun.

"Q And in what hand were you holding the BB gun that resulted in your 2006 conviction?

"A Left."

Outside the presence of the jury, defense counsel objected that the entire line of questioning was improper because it was beyond the scope of direct examination, inasmuch as counsel never asked defendant if he was capable of using his right hand to hold a gun, and defendant never testified in that regard on direct. Counsel reiterated that he asked questions of defendant and the People's witnesses about the perpetrator's hand for identification purposes only, it being the defense's contention that if the victims were robbed by a man with two missing fingers, they should have noticed. Defense counsel asserted the prosecutor questioned defendant on his capabilities for the purpose of finding an opening in which to present more information about defendant's prior offenses.

The court observed defense counsel objected on the grounds of relevance, beyond the scope, and improper cross-examination. It found "clearly relevant" whether defendant, who was accused of wielding a firearm in his right hand during the course of the charged offenses, was capable of doing so. Accordingly, the relevance objection was overruled. The court further found the questioning was not improper cross-examination or beyond the scope of direct examination; defendant made an issue of his ability to use his right hand effectively. Although the questioning of witnesses as to whether they saw the gunman's hand or anything unusual went to the issue of identity, defendant testified he had lost a lot of mobility in his right arm and had to be retrained in something that might only take one hand or limited-hand training. The court explained that during the sidebar conferences, when the People first wanted to address the issue, the court wanted to ensure defendant's testimony was clear as to when any limitation first came into

16.

existence. As a result, the prosecutor asked clarifying questions. In the court's view, defendant's testimony was clear when the alleged disability came into effect, and the People were allowed to explore it further.

Jurors subsequently were instructed that if they found a witness had been convicted of a felony, or had committed a crime or other misconduct, they could consider that fact only in evaluating the credibility of the witness's testimony, and such a circumstance did not necessarily destroy or impair a witness's credibility. The court did not give CALCRIM No. 375, which would have instructed jurors concerning evidence of uncharged offenses admitted pursuant to Evidence Code section 1101, subdivision (b). In part, defense counsel argued to the jury that the witnesses focused their attention on the car and the gun, and when they saw the hand of the man holding the gun, nobody noticed anything wrong. Counsel argued this meant the gunman's right hand was intact. Counsel argued that regardless of what defendant could or could not do with his right hand, it was inconceivable the victims would have failed to notice the injury to the right hand if the robber had had such an injury. Counsel further argued that if defendant wielded a gun, he did so with his left hand, as confirmed by Wallace's testimony that when defendant saw the police, he dropped his left hand toward his waistband. Defense counsel suggested the witnesses attached defendant's face to the physique of Medina, who was the man holding the gun. The prosecutor responded by acknowledging the victims all said the gun was held in the right hand. She argued, however, that they all described the gun as small to medium. Defendant said it was large, like a .40-caliber, but the holster found in the car was closer to the size needed for a .22. The prosecutor argued the fourth and fifth fingers would not be needed to hold a .22-caliber gun. She also argued that a person looking down the barrel of a gun would not be looking for the least necessary two fingers.

17.

**B.    Analysis**

Defendant contends the facts of his prior crimes should not have been presented to the jury. He analyzes the issue under Evidence Code section 1101. That statute provides, in pertinent part:

> "(a) Except as provided in this section . . . , evidence of a person's character or a trait of his or her character (whether in the form of an opinion, evidence of reputation, or evidence of specific instances of his or her conduct) is inadmissible when offered to prove his or her conduct on a specified occasion.
>
> "(b) Nothing in this section prohibits the admission of evidence that a person committed a crime, civil wrong, or other act when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, [or] absence of mistake or accident . . . ) other than his or her disposition to commit such an act.
>
> "(c) Nothing in this section affects the admissibility of evidence offered to support or attack the credibility of a witness."

The evidence at issue in the present case was not introduced to show propensity or for purposes specified in subdivision (b) of Evidence Code section 1101, but rather on the question of defendant's credibility and to rebut the implication he was incapable of holding a firearm at the time of the charged offenses. Accordingly, the restrictions contained in Evidence Code section 1101 are inapplicable, and analysis of defendant's claim is properly based on the objections he raised at trial: relevance, beyond the scope of direct examination, and improper cross-examination. (See, e.g., *People v. Dement* (2011) 53 Cal.4th 1, 35-36, overruled on another ground in *People v. Rangel* (2016) 62 Cal.4th 1192, 1216; *People v. Kennedy* (2005) 36 Cal.4th 595, 619-620, disapproved on another ground in *People v. Williams* (2010) 49 Cal.4th 405, 459; *People v. Millwee* (1998) 18 Cal.4th 96, 130-131; *People v. Freeman* (1994) 8 Cal.4th 450, 494; *People v. Stern* (2003) 111 Cal.App.4th 283, 296.) So analyzed, we find no error.[12]

---

[12]    Even if we were to find the restrictions contained in Evidence Code section 1101 somehow applicable, we would conclude they were not contravened, given the provisions

18.

"To be relevant, evidence must have some 'tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action.' [Citation.] This definition includes evidence 'relevant to the credibility of a witness.' [Citations.]" (*People v. Contreras* (2013) 58 Cal.4th 123, 152; see Evid. Code, §§ 210, 780.) "Unless precluded by statute, any evidence is admissible to attack the credibility of a witness if it has a tendency in reason to disprove the truthfulness of the witness's testimony. [Citations.]" (*People v. Hawthorne* (2009) 46 Cal.4th 67, 99, overruled on another ground in *People v. McKinnon* (2011) 52 Cal.4th 610, 637-643.)

"Evidence tending to contradict a witness's testimony is relevant for purposes of impeachment" (*People v. Cunningham* (2001) 25 Cal.4th 926, 1025), as is "the existence or nonexistence of any fact testified to by the witness. [Citations.] As with all relevant evidence, however, the trial court retains discretion to admit or exclude evidence offered for impeachment. [Citations.] A trial court's exercise of discretion in admitting or excluding evidence is reviewable for abuse [citation] and will not be disturbed except on a showing the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice [citation]." (*People v. Rodriguez* (1999) 20 Cal.4th 1, 9-10.) "Because the court's discretion to admit or exclude impeachment evidence 'is as broad as necessary to deal with the great variety of factual situations in which the issue arises' [citation], a reviewing court ordinarily will

_____

of subdivision (c) and the fact the categories listed in subdivision (b) are not exclusive. (*People v. Catlin* (2001) 26 Cal.4th 81, 146.)

We note that in his discussion of Evidence Code section 1101, defendant cites *People v. Stark* (1992) formerly 8 Cal.App.4th 1605. Review was granted November 19, 1992, S028946, and dismissed as improvidently granted on May 12, 1994. The California Supreme Court did not direct that the opinion remain published. Accordingly, citation of the case violates California Rules of Court, rules 8.1105(e) and 8.1115, the amendments to those rules effective July 1, 2016, not being applicable.

uphold the trial court's exercise of discretion. [Citations.]" (*People v. Clark* (2011) 52 Cal.4th 856, 932.)

A defendant who takes the witness stand puts his or her own credibility in issue and is subject to impeachment in the same manner as any other witness. (*People v. Gutierrez* (2002) 28 Cal.4th 1083, 1139.) "A witness may be impeached with any prior conduct involving moral turpitude whether or not it resulted in a felony conviction, subject to the trial court's exercise of discretion under Evidence Code section 352. [Citations.]" (*People v. Clark*, *supra*, 52 Cal.4th at p. 931, fn. omitted.) Defendant does not dispute that his prior convictions involved moral turpitude, nor could he reasonably do so. (See *People v. Robinson* (2011) 199 Cal.App.4th 707, 713, 716 [conviction for being felon in possession of firearm involves moral turpitude]; *People v. Gray* (2007) 158 Cal.App.4th 635, 641 [same re: conviction for robbery].)

"Under California law, the right to cross-examine or impeach the credibility of a witness concerning a felony conviction does not extend to the facts underlying the offense. [Citations.]" (*People v. Casares* (2016) 62 Cal.4th 808, 830; accord, *People v. Heckathorne* (1988) 202 Cal.App.3d 458, 462.)[13] This rule does not apply, however, where the defendant first seeks to mislead the jury or minimize the facts of the earlier

---

[13] A question arises whether this remains an accurate statement of the law following the addition of article I, section 28, subdivision (f)(2) — the "Right to Truth-in-Evidence" provision — to the California Constitution. (See *People v. Wheeler* (1992) 4 Cal.4th 284, 288, 291, 295.) Both *Casares* and *Heckathorne* were decided after enactment of that provision, but its effect apparently was not raised in either case. "[C]ases are not authority for propositions not considered . . . ." (*People v. Brown* (2012) 54 Cal.4th 314, 330.) The California Supreme Court has acknowledged, but not decided, the issue. (See *People v. Watson* (2008) 43 Cal.4th 652, 685-686; *People v. Smith* (2003) 30 Cal.4th 581, 633; see also *People v. Ardoin* (2011) 196 Cal.App.4th 102, 119-120.) Absent some direction from our state's highest court, and because our analysis in the present case does not require us to resolve the matter, we will assume the law remains as stated in *Casares* and *Heckathorne*.

conviction. (*People v. Shea* (1995) 39 Cal.App.4th 1257, 1267; *People v. Heckathorne*, *supra*, 202 Cal.App.3d at p. 462.)

However limited the intended purpose for which defense counsel had defendant show the jury his hand, the trial court reasonably concluded this display, coupled with defendant's testimony about his limited mobility, rendered relevant and within the scope of direct examination the prosecutor's question whether defendant was capable of holding a gun, and, based on defendant's response it was medically impossible, impeachment of him with relevant facts underlying two of his prior convictions. (See *People v. Visciotti* (1992) 2 Cal.4th 1, 51-52; *People v. Senior* (1992) 3 Cal.App.4th 765, 778-779; *People v. Heckathorne*, *supra*, 202 Cal.App.3d at p. 463 [had defendant asserted on direct examination that the incident concerning which he pled guilty was only an accident, prosecutor's questioning concerning underlying facts would have been proper]; see also *People v. Farley* (2009) 46 Cal.4th 1053, 1109-1110.) "Although a defendant cannot be compelled to be a witness against himself, if he takes the stand and denies the evidence presented against him, the permissible scope of cross-examination is ' "very wide." ' [Citation.] A defendant cannot, by testifying to a state of things inconsistent with the evidence presented by the prosecution, thereby limit cross-examination to the precise facts concerning which he testifies. [Citation.] Rather, when a defendant testifies, the prosecutor 'may fully amplify his testimony by inquiring into the facts and circumstances surrounding his assertions, or by introducing evidence through cross-examination which explains or refutes his statements or the inferences which may necessarily be drawn from them.' [Citation.]" (*People v. Hawthorne*, *supra*, 46 Cal.4th at pp. 99-100.)

Even if we were to conclude the evidence was wrongly admitted, we would find the error harmless. Because the evidence was highly probative of disputed issues at trial and did not go solely to defendant's propensity or disposition, its admission did not violate due process. (*People v. Kelly* (2007) 42 Cal.4th 763, 787; see *People v. Albarran*

21.

(2007) 149 Cal.App.4th 214, 230-231; cf. *McKinney v. Rees* (9th Cir. 1993) 993 F.2d 1378, 1384.) Accordingly, any error was one of state law only, and subject to the traditional test of *People v. Watson* (1956) 46 Cal.2d 818, 836. (*People v. Watson*, *supra*, 43 Cal.4th at p. 686.) Under this test, "the erroneous admission of evidence . . . constitute[s] reversible error only if a reasonable probability exists that the jury would have reached a different result had [the] evidence been excluded. [Citations.]" (*People v. Whitson* (1998) 17 Cal.4th 229, 251.)

No such probability exists in the present case. The prosecutor herself limited defendant's testimony concerning the facts of his prior convictions, asking him only whether they involved the use of a firearm and in which hand defendant held the weapon. More importantly, defendant admitted he was present when the charged robberies and attempted robberies took place. Under the circumstances, evidence identifying him as the gunman was overwhelming despite the victims' failure to notice anything unusual about his right hand, particularly since two of the victims were familiar with Medina, who defendant claimed was the perpetrator.

## II. THE TRIAL COURT DID NOT ERR BY INSTRUCTING WITH CALCRIM NO. 225 INSTEAD OF CALCRIM NO. 224.

### A. Background

Defendant requested the giving of CALCRIM No. 224 (Circumstantial Evidence: Sufficiency of Evidence). The People requested that the trial court give both CALCRIM No. 224 and CALCRIM No. 225 (Circumstantial Evidence: Intent or Mental State). During the instructional conference, the court took the view CALCRIM No. 225 was more appropriate than CALCRIM No. 224, because the state of the evidence was such that the main issues were identity, then, if identity was established, intent. The identity issue was based primarily on direct evidence, while intent was based substantially or entirely on circumstantial evidence. Accordingly, the trial court subsequently told the jury, pursuant to CALCRIM No. 225:

22.

"The People must prove not only that the defendant did the acts charged but also that he acted with a particular intent and/or mental state. The instruction for each crime and allegation explains the intent required.

"An intent and/or mental state may be proved by circumstantial evidence.

"Before you may rely on circumstantial evidence to conclude that a fact necessary to find the defendant guilty has been proved, you must be convinced that the People have proved each fact essential to that conclusion beyond a reasonable doubt.

"Also, before you may rely on circumstantial evidence to conclude that the defendant had the required intent and/or mental state, you must be convinced that the only reasonable conclusion supported by the circumstantial evidence is that the defendant had the required intent and/or mental state. If you can draw two or more reasonable conclusions from the circumstantial evidence and one of those reasonable conclusions supports a finding that the defendant did have the required intent and/or mental state and another reasonable conclusion supports a finding that the defendant did not, you must conclude that the required intent and/or mental state was not proved by the circumstantial evidence. However, when considering circumstantial evidence, you must accept only reasonable conclusions and reject any that are unreasonable."

Defendant now contends the trial court should have given CALCRIM No. 224 instead. That instruction would have told jurors:

"Before you may rely on circumstantial evidence to conclude that a fact necessary to find the defendant guilty has been proved, you must be convinced that the People have proved each fact essential to that conclusion beyond a reasonable doubt.

"Also, before you may rely on circumstantial evidence to find the defendant guilty, you must be convinced that the only reasonable conclusion supported by the circumstantial evidence is that the defendant is guilty. If you can draw two or more reasonable conclusions from the circumstantial evidence, and one of those reasonable conclusions points to innocence and another to guilt, you must accept the one that points to innocence. However, when considering circumstantial evidence, you must accept only reasonable conclusions and reject any that are unreasonable."

23.

## B.     Analysis

"An instruction on the principles contained in [CALCRIM No. 224] 'must be given sua sponte when the prosecution substantially relies on circumstantial evidence to prove guilt.  [Citations.]'  [Citation.]"  (*People v. Rogers* (2006) 39 Cal.4th 826, 885; accord, *People v. Yrigoyen* (1955) 45 Cal.2d 46, 49.)[14]  "The instruction . . . should not be given where the evidence relied on is either direct or, if circumstantial, is not equally consistent with a reasonable conclusion of innocence [citation].  The instruction should not be given simply because the incriminating evidence is indirect, e.g., defendant's extrajudicial admissions, but is appropriate only when 'guilt must be inferred from a pattern of incriminating circumstances.'  [Citation.]"  (*People v. Heishman* (1988) 45 Cal.3d 147, 167, abrogated on another ground in *People v. Diaz* (2015) 60 Cal.4th 1176, 1190; see *People v. Wright* (1990) 52 Cal.3d 367, 406, disapproved on another ground in *People v. Williams*, *supra*, 49 Cal.4th at p. 459; *People v. Wiley* (1976) 18 Cal.3d 162, 174-176.)

"The general instruction on sufficiency of circumstantial evidence [CALCRIM No. 224] is a more inclusive instruction on sufficiency of circumstantial evidence than the instruction on sufficiency of circumstantial evidence to prove specific intent or mental state [CALCRIM No. 225], and the former is the proper instruction to give unless the only element of the offense that rests substantially or entirely on circumstantial evidence is that of specific intent or mental state.  [Citations.]"  (*People v. Cole* (2004) 33 Cal.4th 1158, 1222; accord, *People v. Hughes* (2002) 27 Cal.4th 287, 347.)  However, " '[i]t is the general rule that a trial court is not required to instruct on the rules of law applicable to circumstantial evidence where the alleged circumstantial evidence is incidental to, and corroborative of, direct evidence.  [Citations.]'  [Citation.]  Moreover, 'when the only

---

**14**     Cases discussing CALJIC No. 2.01 (sufficiency of circumstantial evidence — generally) and CALJIC No. 2.02 (sufficiency of circumstantial evidence to prove specific intent or mental state) are equally applicable to CALCRIM Nos. 224 and 225.

inference to be drawn from circumstantial evidence points to the existence of a requisite mental state, a circumstantial evidence instruction need not be given *sua sponte*.' [Citation.]" (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1142.) "Indeed, where circumstantial inference is not the primary means by which the prosecution seeks to establish that the defendant engaged in criminal conduct, the instruction may confuse and mislead, and thus should not be given. [Citations.]" (*People v. Anderson* (2001) 25 Cal.4th 543, 582.)

Robbery requires the intent permanently to deprive the victim of his or her property. (*People v. Huggins* (2006) 38 Cal.4th 175, 216.) Intent is almost never proved by direct evidence but rather must be inferred from the act together with the surrounding circumstances. (*People v. Edwards* (1992) 8 Cal.App.4th 1092, 1099; *People v. Johnson* (1972) 28 Cal.App.3d 653, 657.) In the present case, by contrast, defendant's identity as the perpetrator of the charged offenses was based primarily on eyewitness identifications. Circumstantial evidence, such as the holster in defendant's vehicle and the bank cards found in the police vehicle, was merely incidental to, and corroborative of, the direct eyewitness evidence. As the trial court properly determined, CALCRIM No. 224 was not required. (See, e.g., *People v. McKinnon*, *supra*, 52 Cal.4th at p. 676; *People v. Freeman*, *supra*, 8 Cal.4th at p. 506; *People v. Sassounian* (1986) 182 Cal.App.3d 361, 407-408; cf. *People v. Rogers*, *supra*, 39 Cal.4th at p. 885.) The trial court did not err by giving CALCRIM No. 225 instead.[15]

---

[15] Defendant claims, without elaboration or citation of authority, that the failure to give CALCRIM No. 224 violated his due process rights and his right to a fair trial. Having found no error, we need not address the question of prejudice. We note, however, that "[a] point not argued or supported by citation to authority is forfeited. [Citation.]" (*People v. Anderson* (2007) 152 Cal.App.4th 919, 929.) We also note "the federal Constitution does not require trial courts to instruct on the evaluation of circumstantial evidence when, as here, the jury is properly instructed on the reasonable doubt standard. [Citations.]" (*People v. McKinnon*, *supra*, 52 Cal.4th at p. 677.)

## III. DEFENDANT IS NOT ENTITLED TO HAVE THE FIREARM USE ENHANCEMENTS STRICKEN.

Jurors were instructed, pursuant to CALCRIM No. 3146, that if they found defendant guilty of the crimes charged in counts 1 through 4, they must then decide whether the People "proved the additional allegation that the defendant personally used a firearm during the commission of" each of those crimes. After being given the elements of a section 12022.53, subdivision (b) enhancement, jurors were told: "The People have the burden of proving each allegation beyond a reasonable doubt. If the People have not met this burden, you must find that the allegation has not been proved." The "guilty" verdict form for each of the four counts included a blank space for the jury to find "proven" or "not proven" "that, in the commission of the above offense, the defendant, PAUL RICHARD PRIETO, personally used a firearm within the meaning of Penal Code section 12022.53(b)." The signed and filed verdict forms show, as to each of the four counts, "PROVEN" written where the form instructed "proven" or "not proven" was to be inserted.

Despite the fact he did not object to the verdict forms, defendant now contends the enhancements must be stricken because the jury did not render true findings on the firearm use allegations.[16] He bases this solely on subdivision (j) of section 12022.53, which provides: "For the penalties in this section to apply, the existence of any fact required under subdivision (b), (c), or (d) shall be alleged in the accusatory pleading and either admitted by the defendant in open court or *found to be true* by the trier of fact. When an enhancement specified in this section has been admitted or *found to be true*, the court shall impose punishment for that enhancement pursuant to this section . . . ." (Italics added.)

---

[16] "An objection to jury verdict forms is generally deemed waived if not raised in the trial court. [Citations.]" (*People v. Toro* (1989) 47 Cal.3d 966, 976, fn. 6, disapproved on another ground in *People v. Guiuan* (1998) 18 Cal.4th 558, 568, fn. 3; but see *In re Birdwell* (1996) 50 Cal.App.4th 926, 930-931.)

" ' " 'A verdict is to be given a reasonable intendment and be construed in light of the issues submitted to the jury and the instructions of the court.' [Citations.]" [Citations.] "The form of a verdict is immaterial provided the intention to convict of the crime charged is unmistakably expressed. [Citation.]" [Citation.] "[T]echnical defects in a verdict may be disregarded if the jury's intent to convict of a specified offense within the charges is unmistakably clear, and the accused's substantial rights suffered no prejudice. [Citations.]" [Citation.]' [Citations.]" (*People v. Jones* (2014) 230 Cal.App.4th 373, 378-379; accord, *People v. Paul* (1998) 18 Cal.4th 698, 706-707.) "A statutory requirement that the jury expressly find against a defendant on an issue is satisfied if the intention to convict of the crime is unmistakably expressed. [Citation.] 'The verdict is insufficient only "if it be susceptible of a different construction than that of guilty of the crime charged." ' [Citation.]" (*People v. Chevalier* (1997) 60 Cal.App.4th 507, 514.) "Any error in grammar or the use of words when the language clearly shows what is intended is wholly immaterial." (*People v. Dutro* (1925) 75 Cal.App. 138, 144.) "The same rules apply to a finding on a sentence enhancement allegation. [Citation.]" (*People v. Chevalier*, *supra*, 60 Cal.App.4th at p. 514.)

Defendant's jury was instructed on proof beyond a reasonable doubt and that when told the People must prove something, it meant the People must prove it beyond a reasonable doubt. Defendant fails to explain how, under these circumstances, there can be any meaningful difference between a finding the enhancement allegation is "true" and a finding it is "proven." "[P]rove" is defined, inter alia, as "to establish the truth of (as by argument or evidence)." (Webster's 3d New Internat. Dict. (1986) p. 1826.) Thus, in light of the instructions, finding an allegation "proven" is synonymous with finding it "true." (See *People v. Buckley* (1874) 49 Cal. 241, 242.)

"Here, it is clear the jury intended to find each [firearm use enhancement] allegation] true. It made such findings to the best of its ability, with the verdict forms it

27.

had been given." (*People v. Jones* (1997) 58 Cal.App.4th 693, 711.)  We decline to read subdivision (j) of section 12022.53 in a manner that would exalt form over substance.

## DISPOSITION

The judgment is affirmed.

_____
DETJEN, J.

WE CONCUR:


_____
GOMES, Acting P.J.


_____
FRANSON, J.