Filed 11/17/20  P. v. White CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>WILLIAM ALLEN WHITE,<br><br>Defendant and Appellant. | F076682<br><br>(Merced Super. Ct.<br>No. 15 CR-00084C)<br><br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Merced County.  Ronald W. Hansen, Judge.

Christine Vento, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Gerald A. Engler and Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Daniel B. Bernstein, Keith P. Sager, and Stephanie A. Mitchell, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

Defendant William Allen White and several accomplices committed a home invasion robbery. During the robbery, a victim and one of the accomplices struggled over a gun. During the struggle, the victim discharged the gun several times, likely firing the fatal shot that killed one of defendant's accomplices.

The jury was instructed on several theories of murder, including felony murder and provocative act murder. Under the felony-murder rule, a defendant is liable for murder when he or an accomplice kills someone during the commission or attempted commission of an inherently dangerous felony. (*People v. Gonzalez* (2012) 54 Cal.4th 643, 654 (*Gonzalez*).) Felony-murder liability does not require intent to kill or implied malice, only an intent to commit the underlying felony. (*Ibid.*) However, it only applies when the defendant or an accomplice commits the killing. (*Ibid.*) If someone else commits the killing, the defendant may still be liable under the provocative act doctrine. (*Ibid.*) However, liability under the provocative act doctrine *does* require that the defendant personally harbored malice. (*Id* at p. 655.)

We reject the bulk of defendant's challenges. The Attorney General concedes that three prior prison term enhancements must be stricken, and we accept that concession. Additionally, we conclude that the matter must be remanded for resentencing pursuant to Senate Bill No. 1393 (2017–2018 Reg. Sess) (Senate Bill 1393). We otherwise affirm the judgment.

## BACKGROUND

On April 26, 2016, the Merced County District Attorney filed an information charging defendant William Allen White ("defendant") and his codefendant, Victor Hernandez, with several crimes. The information charged defendant with murder (count 1; Pen. Code, § 187, subd. (a))[1] with personal firearm use (§§ 12022.53, subd. (b) & 12022.5, subd. (a)) and discharge (§ 12022.53, subd. (c)) enhancements; two counts of

---

[1] All further statutory references are to the Penal Code unless otherwise stated.

home invasion robbery (counts 2–3; §§ 211, 213) with personal firearm use (§ 12022.53, subd. (b)) and discharge (§ 12022.53, subd. (c)) enhancements; and first degree burglary with a person present (count 4; § 459) with a personal firearm use enhancement (§ 12022.5, subd. (a)). The information further alleged defendant had suffered two prior strikes (§§ 667, subd. (d) & 1170.12, subd. (b)); two prior serious felony convictions (§ 667, subd. (a)(1)); and two prison priors (§ 667.5, subd. (b).)

The jury convicted defendant on all counts and found true each of the weapon enhancements. In a bifurcated proceeding, the trial court found the prior convictions allegations true.

The court sentenced defendant to a total term of 233 years to life. On count 1, the court sentenced defendant 25 years to life, tripled to 75 years to life for the prior strikes (see § 667, subd. (e)(2)(A)(i)) on count 1, plus 20 years for the gun enhancement (§ 12022.53, subd. (c)); plus 10 years for the two prior serious felony convictions (§ 667, subd. (a)), plus 2 years for the two prior prison term enhancements (§ 667.5, subd. (b)). On count 2, the court sentenced defendant a consecutive term of 31 years to life, plus 20 years for the gun enhancement (§ 12022.53, subd. (c)), plus 10 years for the two prior serious felony enhancements (§ 667, subd. (a)), plus 2 years for the two prior prison term enhancements (§ 667.5, subd. (b)). The court imposed the same, consecutive sentence on count 3 as it imposed for count 2. On count 4, the court sentenced defendant to a stayed (§ 654) term of 25 years to life, plus 10 years for the gun use enhancement (§ 12022.53, subd. (c)), plus 2 years for the two prior prison term enhancements (§ 667.5, subd. (b)).

## FACTS

Juan Alvarez and Victor Hernandez had been friends for years before the night of July 31, 2014. Juan[2] trusted Victor like a brother. Juan had also known Victor's friend, Orlando Yepez, "[o]n and off" for a year. Orlando also went by the name "Fat Joe."

Juan testified that he had a lengthy criminal history and had been involved in cases involving drugs and guns. Juan had been convicted of misdemeanor domestic violence, money laundering, felony possession of drugs, "conspiracy to distribute" and assault with a deadly weapon.

Together, Juan and Orlando would rob other drug dealers. They would buy smaller quantities of drugs, obtain the drug dealer's trust, and then request a larger amount of drugs and rob the dealer. Juan would provide the money for the initial drug purchases.

The last time Juan and Orlando robbed a drug dealer in this fashion was on July 30, 2014. The robbery was successful, and Juan got his money back from the scheme. As a result, Orlando knew Juan had $50,000 or more in his possession.

The next night, Juan was at a home in Hilmar with his girlfriend, Gloria Chavez. Juan was making a sandwich while Gloria watched television. At one point, Juan's brother arrived at the home to pick up a check.

After Juan's brother left, there was another knock. Gloria assumed it was Juan's brother returning, but it was Victor and Orlando. Juan was surprised to see the two men. Victor and Orlando were wearing black clothing and hoodies. Victor was wearing gloves.

---

[2] Several parties to the events at issue share last names. For clarity and consistency, we will use first names.

4.

Orlando told Juan he had been robbed. Orlando told Juan he wanted help recovering what had been taken from him. Juan told Orlando he did not want to go and that he might help tomorrow. Juan told Orlando "no" several times.

Orlando asked Juan if he had a gun and Juan said, "No." Juan asked, "Why are you guys wearing all black?" Orlando then punched Juan in the face. Juan fell back and starting swinging at Orlando.

As Juan and Orlando were fighting, two other men entered the home, running in through the front door. The two men were defendant and Victor's brother, Jose Hernandez. Jose began stabbing Juan with a screwdriver. Victor was saying, "Stab him." Juan tried to block the screwdriver and was stabbed in his left hand.

Victor "rush[ed]" at Juan with a black handgun and tried to hit him with it. Juan and Victor began fighting over the gun. Juan testified as to what happened next:

> "We were fighting for the gun. I twisted it from him, and then I started putting my finger inside the trigger so I can let the shots go off. And that's when [Victor] shot himself" in the leg.

Juan then "kept pushing" the trigger so that "there would be no more bullets" in the gun. The shots were going towards the kitchen, and Juan "guess[es] that's how Orlando must have got hit." Juan did not see Orlando get shot but knew Orlando had been shot because he was on the floor. Juan finally obtained control of the gun, but it had no more bullets.

Juan saw that defendant was on top of Gloria, holding her down on the living room floor. He was holding a firearm.[3]

Jose ran out of the front door. Defendant began firing a gun at Juan. Juan knelt down until defendant stopped firing and then ran into the garage. Juan opened the garage door and ran to a neighbor's house. The assailants took between $8,000 and $10,000.

---

[3] Gloria said the gun was a "black rifle"; Juan said the gun was a handgun.

5.

After no one answered at the first few houses he tried, Juan called 911.[4]  Juan was bleeding from his back and hand.  Juan heard Gloria calling for him down the street.

Defendant and Victor were in a car, screaming and looking for Jose.  Victor got into the driver's side door of his car and pointed his gun at Gloria.  Once they drove away, Juan went back into the house.  Juan saw Orlando lying on the floor with "the big gun" on his lap.  The police arrived, and Juan told them that "they" had tried to rob and murder him.  Juan also told officers he had shot one of them.  Juan had blood coming down his left arm "towards his hand."

Law enforcement officers found blood in the kitchen/living room area, the hallways, and outside.  Some of the blood found on the ground belonged to Juan.

Law enforcement located a rifle under Orlando, a .45-caliber Colt pistol on the couch, and a shotgun in a bedroom closet.  Juan's blood was found on the Colt pistol's grip, trigger and magazine.  A print on the magazine matched six points of Victor's left palm print.  However, to establish an identification, the California Department of Justice requires eight clear matching points.  Juan testified the .45-caliber pistol found on the couch was Victor's.[5]

At the preliminary hearing, Juan testified the rifle – identified as an AR-15 – had been in the home before Orlando arrived.  Juan said Orlando grabbed the rifle when he came in the house.  At trial, Juan denied that he had a rifle in his house.

Two screwdrivers were also located in the residence.  A forensic DNA analyst with the California Department of Justice was unable to locate blood on the screwdrivers.  If the screwdrivers had been used to stab someone, the analyst would have expected to

---

[4] During the call, Juan said, "They came in with guns, I took their guns away and I shot one of them."

[5] At the preliminary hearing Juan had indicated that the gun found on the couch was one he and others had taken "away from the people at the – of the drugs."  At trial, Juan denied that the gun had been taken from a prior robbery.

find blood on them. The analyst did find DNA on the screwdrivers, but not enough to "interpret the information."

Law enforcement located six .45-caliber casings (five on the living room floor and one on the kitchen floor) and eight 9-millimeter casings (all on the kitchen floor). No nine-millimeter firearms were found at the scene.[6]

There were several bullet holes found in the residence. Based on the "trajectory angles," law enforcement concluded that shots had been fired from the kitchen towards the living room.

Law enforcement also found a phone registered to defendant's girlfriend between some bushes across the street from the residence.

*Police Interviews*

The next day, Juan told detectives: "We were 'fighting with the f[**]king gun right and that's when I f[**]king grabbed it and I shot and it just kept letting loose [] the whole f[**]king clip with his own gun….' "

Juan also told detectives he had "problems with the cartels." The cartels had given Juan "some shit" and he "got busted with it." Later, Juan said it was his friend who was "busted" with $200,000 worth of "weed." The cartel looked to Juan to pay them for the incident.

Juan speculated that the cartels paid Orlando to "grab" him and take him to "TJ" where he would be killed.

Juan initially told law enforcement that the money belonged to either his sister or Gloria. Later, Juan said the money belonged to his sister. When asked if Orlando came to the house to take the money, Juan said, "No, hell no." At trial, however, Juan testified

---

[6] On August 15, 2014, law enforcement searched a residence in Chowchilla. Items at the residence led officers to conclude Juan lived there. A stolen nine-millimeter pistol was found in the home.

7.

that the assailants took $8,000 to $10,000 of his (Juan's) money. Juan also testified Orlando knew Juan had at least $40,000.

*Orlando's Girlfriend's Testimony*

Orlando's girlfriend told police Orlando had gotten into an argument with Juan a couple days before the incident and was "really mad."

On the day of the incident, Orlando had begun crying and told his girlfriend and her daughter that he loved them. Orlando told her that she would be safer if she went to her mother's house, and that he was "gonna go do somethin[g]." Orlando also seemed, "very nervous." Around 10:00 or 11:00 p.m., Victor and Hugo arrived in a gray or white BMW and Orlando left.

*Defendant's Girlfriend's Testimony*

Defendant's girlfriend testified under a grant of immunity.[7] She testified that defendant often went to a Walmart in Tracy to buy or sell drugs. On the night of the incident, defendant and his girlfriend drove towards the Walmart and met Jose. Before arriving, defendant received a phone call. During the phone call, defendant said, "Put me on. Put me on." "Put me on" means to "hook me up" with "drugs or some activity." After the phone call concluded, defendant told his girlfriend they were going to drive farther to meet with Jose. They drove to Jose's house and stopped there for about an hour. They subsequently drove to a liquor store where they picked up an individual. Though there was conflicting evidence on the point, it seems apparent this individual was Jose's brother, Hugo Hernandez.[8]

---

[7] Before immunity was granted, she lied to police, saying that she "didn't know anything."

[8] When defendant's girlfriend was shown a photograph of Hugo, she said that was not the person they picked up. However, defendant's girlfriend acknowledged that it was "dark" and "a long time ago," so she was uncertain of the identity of the individual. Defendant himself testified that Hugo was the other person in the car. We will refer to the individual as Hugo.

Defendant drove the four of them – defendant, his girlfriend, Jose, and Hugo– for a long time down a "desolate road." Along the way, the men had "a lot" of phone calls during which they spoke Spanish.

At some point a black BMW pulled up alongside them. Jose went into the BMW, and then returned with a backpack. They resumed driving, following the black BMW. They eventually arrived in a residential area and parked. Defendant told his girlfriend, "I'll be right back. I promise. I love you." Defendant and Jose then left the car. Hugo got into the driver's seat.

About two to four minutes after defendant and Jose left, defendant's girlfriend heard what sounded like gunshots. The shots were not all consecutive – she heard "[m]aybe four and then maybe four more, three more. Something to that effect." No more than three minutes after the last series of gunshots, she saw defendant running back to the car. Defendant had been gone for "seven minutes at the most." Defendant screamed, "Move, move, move." He had cash in his hands.

Jose never returned to the car. Defendant said Jose had left with his other brothers in the black BMW. Hugo got into the back seat and kept asking, "Where's my brothers?" Defendant said, "They're fine. They're with your older brother. They're all together."

Defendant said "they" had brought a gun with them into the house but the "gun got taken" and used on "Fats." Defendant said Jose had been shot in the leg, but that he was okay. However, defendant said that their friend was not "going to make it." Defendant's girlfriend could not recall whether defendant referred to his friend as "Fats" or "Gordo."

The group also discussed the fact that the "house lick went bad." According to defendant's girlfriend, "house lick" was a "[s]treet term" that referred to a robbery. Defendant said, "One of the people got a gun and shot the guy Fats."

They drove to a gas station, where defendant asked his girlfriend to pump because he did not want to get out of the car. Defendant asked his girlfriend to remove a piece of

9.

paper that had been covering the license plate. She complied. The next day, defendant gave her $400 or $500.

Defendant's girlfriend told him he was "stupid" for wearing short sleeves, because he could be identified by his tattoos. The day after the incident, defendant was worried about getting caught and was "looking on the computer for what happened."

Defendant told her he owed Jose money for drugs.

*Police Interview of Victor Hernandez*

Police interviewed Victor on January 21, 2015.[9] Victor admitted being at the scene of the murder and being shot in the leg.

He said Orlando called him earlier on the day of the incident to say that "they" did not pay him money he was owed. Victor explained, "I guess [Orlando] introduced [] one of his friends to some other guy and … they robbed him." Subsequently, Victor indicated Juan was the "friend" who committed this robbery. The unnamed victim of Juan's robbery told Orlando that since he had "introduced" them, it was Orlando's responsibility to get the victim's "shit back."

Victor drove his father's BMW, by himself, to Orlando's house around 10:00 p.m.

*Police Interview of Salvador Jimenez*

Detective Jose Sanchez interviewed Salvador Jimenez at the Contra Costa County Jail. Jimenez told Detective Sanchez he was an inmate with defendant at the jail. Jimenez claimed defendant told him "that he and four to five other individuals had traveled to the residence of the crime scene and had taken money, guns, and drugs." Jimenez said defendant was worried because detectives found his cell phone near the crime scene. Defendant identified himself as one of the shooters, calling himself a "gunman." Defendant told Jimenez he had been carrying a rifle or a shotgun. Defendant

_____

[9] Both parties rely on the written transcript for Hernandez's interview, and we will do the same.

10.

claimed he was going to receive cash for being the gunman for the job. Defendant took $10,000 from the house and dropped $4,000 of it as he ran away from the scene.

Detective Sanchez said the story Jimenez relayed was corroborated by other statements and crime scene evidence. Specifically, Jimenez saying defendant told him he had dropped cash on the way out of the residence was consistent with the fact that cash was located on a nearby lawn.

At trial, Jimenez acknowledged he was incarcerated at the Contra Costa County jail in the fall of 2014. However, Jimenez said he did not remember defendant talking to him about a robbery/murder in which defendant was involved. Jimenez also said he did not recall giving a statement to Detective Sanchez.

After Jimenez finished giving his trial testimony, he looked at defendant and whispered, "[G]ood." Defendant nodded his head in acknowledgment.

*Autopsy*

Orlando suffered two gunshot wounds. One gunshot entered around his left collar bone and exited his right flank. This gunshot was the cause of death, striking Orlando's lung, heart and liver. The other gunshot grazed his right shoulder.

The doctor performing the autopsy removed Orlando's clothing, which included a black jersey and dark blue jeans.

*Cell Phone Evidence*

Victor's cell phone "pinged in the Hilmar area" at 12:42 a.m. on the night of the murder, the same time the 911 call was made. At 12:52 a.m., Victor's cell pinged a tower in Turlock, California, north of the murder scene. At 12:55 a.m., Victor's cell pinged another tower in Turlock, "slightly north" of the tower pinged by the prior call.

A cell phone number attributable to Jose's wife was involved in nine outgoing or incoming calls between 11:34 p.m. and 11:45 p.m. on the night of the murder. They all pinged a tower in Hilmar approximately 2.3 miles from the murder scene. The majority of the calls were from or to Hugo.

11.

Hugo's cell phone made 13 outgoing calls to Jose's wife's phone between 12:39 a.m. and 12:45 a.m. on the night of the murder. All the calls pinged off the same tower in Hilmar, a short drive away from the murder scene.

Defendant's girlfriend's phone traveled from the Bay Area to the Central Valley on the day of the murder. Several calls were made to Jose on the night of the murder.

*Defendant's Testimony*

Defendant testified. He admitted to being convicted of second degree robbery, assault by means of force likely to produce great bodily injury, auto theft, and evading a peace officer in a vehicle in 2003. He also admitted that he was convicted of attempted first degree burglary on November 7, 2011.

At the time of the incident, defendant was living with his parents in Antioch and dating his girlfriend. At the time, defendant would get high on methamphetamine on weekends, and would also sell methamphetamine. Defendant's source for purchasing methamphetamine was Jose Hernandez, who he initially met in Avenal State Prison. Defendant would purchase the drugs in the Central Valley.

Jose had sold defendant some poor quality methamphetamine. Jose said he would reimburse defendant for the purchase. On July 31, 2014, defendant and his girlfriend drove to the Central Valley to get the reimbursement money from Jose. They arrived in Modesto after 10:00 p.m. and went to Jose's house. After about 30 to 45 minutes, Jose, defendant and defendant's girlfriend left in defendant's car. They went to a liquor store to purchase wraps to use in rolling marijuana. Then they went to a location off of a nearby freeway and picked up Jose's brother Hugo. Jose directed defendant to get on a freeway and head towards Turlock and subsequently told him to get off on a particular exit. Defendant testified that he believed they were traveling to a place where defendant could "get hooked up with" a guy that was growing weed.

Eventually, Jose pointed out a vehicle and said, "Oh, there's my brother's car." Defendant pulled up next to the vehicle. Defendant, Jose and Hugo exited the vehicle.

12.

Defendant told Jose to tell Hugo to stay in the car with his "girl." Hugo returned to the vehicle.

Defendant and Jose approached a house and heard a commotion inside. Orlando and Victor were already inside. Juan's girlfriend answered the door and she looked like she had been drinking. She looked at Jose and smiled and said, "They're in the kitchen." She then went to a nearby couch.

Juan and Orlando were arguing. Defendant tapped Jose and asked, "[W]hat the f[**]k is going on, fool?" Jose said, "Hold on, fool." Juan pushed Orlando. Orlando punched Juan. Defendant was "pretty sure" it was Juan who then pulled out a gun (though defendant was "not 100 percent" sure). Defendant did not know what was going on and ran out the door. Defendant might have pushed Juan's girlfriend onto the couch on his way out. Defendant heard gunshots but did not see who fired them.

As he was running away, defendant fell in the front yard or the street. He dropped $1,800 he had been carrying in his pockets,[10] as well as his cell phone and his keys. While outside, defendant heard more gunshots. Defendant eventually found his keys and some of the money he had dropped. Defendant jumped in the car and said he did not know " 'what the hell is going on.' " Defendant told Hugo his brother was fine. Someone told defendant that "Fat Joe or Gordo, or something, got shot." This "meant absolutely nothing" to defendant because he did not know who Gordo was. Defendant drove away, stopped across from a 7-Eleven and told Hugo to get out. Hugo got out and defendant drove back to the Bay Area.

Defendant said he had not met Orlando prior to the night of the robbery. Defendant testified he did not know anything about a prior robbery involving Juan, Orlando and the Hernandezes. Defendant claimed he had no firearms with him that night

---

[10] Defendant claimed this was money he received from working, from his mother, and from a drug sale.

and did not shoot anyone. He also testified that he did not know there was going to be any firearm activity that night. Defendant also denied taking any money, drugs or firearms from the house. Defendant denied being in debt to Jose.

## DISCUSSION

**I.      Defendant's Sole Means of Invoking Senate Bill No. 1437 Retroactively is the Petition Procedure Prescribed Therein**

"Murder is the unlawful killing of a human being, or a fetus, with malice aforethought." (§ 187, subd. (a).) Malice is either "a deliberate intention to take away the life of a fellow creature" (§ 188) or dangerous conduct undertaken by a defendant who " ' "knows that his conduct endangers the life of another and … acts with a conscious disregard for life." [Citation.] [Citation.]" (*People v. Chun* (2009) 45 Cal.4th 1172, 1181, fn. omitted.)

However, when the felony-murder rule applies, malice is "imputed" rather than proven. "The felony-murder rule makes a killing while committing certain felonies murder without the necessity of further examining the defendant's mental state." (*People v. Chun*, *supra*, 45 Cal.4th at p. 1182.) Specifically, the rule " 'imputes the requisite malice for a murder conviction to those who commit a homicide during the perpetration of a felony inherently dangerous to human life.' [Citation.]" (*Id*. at p. 1184.) This was the state of the law when defendant was tried for murder.

Senate Bill No. 1437 (2017–2018 Reg. Sess.) (Senate Bill 1437) made important changes to the law effective January 1, 2019 (after defendant's trial). (*People v. Prado* (2020) 49 Cal.App.5th 480, 487.) Senate Bill 1437 amended section 188, which now provides, in part: "Except as stated in subdivision (e) of Section 189, in order to be convicted of murder, a principal in a crime shall act with malice aforethought. Malice shall not be imputed to a person based solely on his or her participation in a crime." (§ 188, subd.(a)(3); Stats. 2018, ch. 1015, §§ 2–4.)

14.

Senate Bill 1437 also amended section 189, which now provides in part:

"A participant in the perpetration or attempted perpetration of a felony listed in subdivision (a) in which a death occurs is liable for murder only if one of the following is proven:

"(1) The person was the actual killer.

"(2) The person was not the actual killer, but, with the intent to kill, aided, abetted, counseled, commanded, induced, solicited, requested, or assisted the actual killer in the commission of murder in the first degree."

"(3) The person was a major participant in the underlying felony and acted with reckless indifference to human life, as described in subdivision (d) of Section 190.2"  (§ 189, subd. (e).)

Senate Bill 1437 also created a petition procedure for certain people to retroactively obtain its benefits.  (See § 1170.95.)  "A person convicted of felony murder or murder under a natural and probably consequences theory may file a petition with the court that sentenced the petitioner to have the petitioner's murder conviction vacated and to be resentenced on any remaining counts" when certain conditions apply.  (§ 1170.95, subd. (a).)  Among the conditions is a requirement that Senate Bill 1437's changes to sections 188 and 189 must preclude the petitioner's conviction for first or second degree murder.  (§ 1170.95, subd. (a)(3).)

If the matter proceeds to a hearing, the prosecution bears the burden of proving that the petitioner is inelligble for resentencing.  (§ 1170.95, subd. (d)(3).)  If petitioner prevails, the court shall vacate the conviction and resentence the petitioner on remaining charges.  (§ 1170.95, subd. (d)(3).)

A.     *Retroactive Application of Senate Bill 1437*

Defendant contends that Senate Bill 1437 applies retroactively to his case and that this court should set aside his murder conviction.

Changes to the Penal Code are not retroactive "unless expressly so declared." (§ 3.)  By establishing the petition procedure described above, Senate Bill 1437 "expressly … declared" (§ 3) a specific way its changes are retroactive.  Thus, the parties

15.

do not dispute that Senate Bill 1437 is retroactive, in that certain defendants who have already been sentenced can petition to be resentenced.

Defendant is arguing Senate Bill 1437 is retroactive in an additional way. He contends that appellate courts should directly apply its substantive changes in evaluating the nonfinal convictions of defendants tried after its effective date. Nothing in Senate Bill 1437 supports it being retroactively applied in *that* fashion.[11] To the contrary, the enumeration of a specific way in which the statute applies retroactively – i.e., the petition procedure – strongly indicates that it is not retroactive in additional, unstated ways. (*People v. Martinez* (2019) 31 Cal.App.5th 719, 727; see also § 3.) The petition process outlined in Senate Bill 1437 is the sole means by which defendant can seek relief based on its substantive changes to the law. The weight of appellate authority is in agreement. (See *People v. Cervantes* (2020) 46 Cal.App.5th 213, 220–221; *People v. Munoz* (2019) 39 Cal.App.5th 738, 751–753, rev. granted Nov. 26, 2019, S258234; *People v. Lopez* (2019) 38 Cal.App.5th 1087, 1113, rev. granted Nov. 13, 2019, S258175; *People v. Anthony* (2019) 32 Cal.App.5th 1102, 1147–1158 (*Anthony*); *People v. Martinez*, *supra*, 31 Cal.App.5th at p. 724.)

Defendant counters with language from section 1170.95, subdivision (f), stating the statute "does not diminish or abrogate any rights or remedies otherwise available to the petitioner." (§ 1170.95, subd. (f).) However, " 'there is no indication that reversal of a defendant's sentence on direct appeal without compliance with the procedures outlined in section 1170.95 was among the "rights" the Legislature sought to preserve in enacting Senate Bill 1437.' [Citation.]" (*Anthony*, *supra*, 32 Cal.App.5th at p. 1157.)

---

[11] Defendant argues the changes brought by Senate Bill 1437 essentially added elements to the crime of felony murder and there is no express provision "saving" existing murder judgments. These aspects of the statute might suggest it is retroactive in the manner defendant suggests, if not for the statute's petition procedure.

Defendant contends that limiting him to the petition procedure would violate his constitutional right to a jury trial. "This argument is unpersuasive because the retroactive relief they are afforded by Senate Bill 1437 is not subject to Sixth Amendment analysis. Rather, the Legislature's changes constituted an act of lenity that does not implicate defendants' Sixth Amendment rights. [Citation.]" (*Anthony*, *supra*, 32 Cal.App.5th at p. 1156.)

Finally, defendant contends Senate Bill 1437 is different from the enactments addressed in *People v. Conley* (2016) 63 Cal.4th 646, 651 and *People v. DeHoyos* (2018) 4 Cal.5th 594. *Conley* held that defendants were required to use Proposition 36's petition procedure and could not obtain automatic resentencing on appeal. (*Conley*, *supra*, 63 Cal.4th at p. 652.) *DeHoyos* similarly held that resentencing under Proposition 47 could "only" be obtained through the petition procedure. (*DeHoyos*, *supra*, 4 Cal.5th at p. 597.) Defendant argues that, unlike Senate Bill 1437, Proposition 36 and Proposition 47 required that trial courts assess the degree to which the petitioner's early release would pose a danger to public safety. However, "[w]hile defendant is correct that section 1170.95 does not require a dangerousness inquiry, neither *Conley* nor *DeHoyos* holds that inquiry was the indispensable statutory feature on which the result in those cases turned." (*People v. Martinez*, *supra*, 31 Cal.App.5th at p. 728.)

Consequently, the petition procedure is defendant's sole avenue to invoke Senate Bill 1437, and we decline to consider, in the present appeal, defendant's arguments predicated on Senate Bill 1437.

## II.    Defendant has not Established that the Court's Felony-Murder Instructions Were Erroneous

Defendant next argues the court gave erroneous instructions regarding felony murder.[12]

---

[12] The Attorney General argues this contention was forfeited when defendant failed to raise the issue below. Because defendant raises an ineffective assistance of

"Under the felony-murder doctrine, when the defendant or an accomplice kills someone during the commission, or attempted commission, of an inherently dangerous felony, the defendant is liable for either first or second degree murder, depending on the felony committed." (*Gonzalez*, *supra*, 54 Cal.4th at p. 654, italics omitted.) "Felony-murder liability does not require an intent to kill, or even implied malice, but merely an intent to commit the underlying felony. [Citation.]" (*Ibid*.) Thus, felony murder can apply even when the killing is negligent or unintentional. (See *People v. Johnson* (1972) 28 Cal.App.3d 653, 658.)

"If the killing is not committed by the defendant or an accomplice, however, the felony-murder doctrine does not apply. [Citation.]" (*Gonzalez*, *supra*, 54 Cal.4th at p. 654.) This caveat is at the center of defendant's claim of instructional error.

"In reviewing any claim of instructional error, we must consider the jury instructions as a whole, and not judge a single jury instruction in artificial isolation out of the context of the charge and the entire trial record. [Citations.]" (*People v. Dieguez* (2001) 89 Cal.App.4th 266, 276.)

### A.    Court's Instructions

The court instructed the jury:

> "The defendants are charged in Count One with murder under a theory of felony murder.

> "To prove that a defendant is guilty of first-degree murder under this theory, the People must prove that: One, the defendant committed robbery or burglary; two, the defendant intended to commit robbery or burglary; and, three, when committing robbery or burglary, the defendant caused the death of another person."

---

counsel claim in the alternative, we will reach the merits. (E.g., *People v. Turner* (1990) 50 Cal.3d 668, 708–709.) In any event, no request for a clarifying pinpoint instruction was needed because, as we explain below, the felony-murder instructions accurately and sufficiently conveyed the relevant law.

"[A] person may be guilty of felony murder even if the killing was unintentional, accidental, or negligent.

Shortly thereafter, the court instructed:

"The defendants may also be guilty of murder under a theory of felony murder even if another person did the act that resulted in the death. I will call the other person "the perpetrator."

"To prove that a defendant is guilty of first-degree murder under this theory, the People must prove that: One, the defendant committed or aided and abetted or was a member of the conspiracy to commit robbery or burglary; two, the defendant intended to commit and intended to aid and abet the perpetrator in committing or intended that one or more members of the conspiracy commit robbery or burglary; three, if the defendant did not personally commit robbery or burglary, than a perpetrator whom the defendant was aiding or abetting or with whom the defendant conspired, personally committed robbery or burglary; and, four, when committing robbery or burglary, the perpetrator caused [the] death of another person.

"A person may be guilty of felony murder even if the killing was unconditional,[13] accidental, or negligent.

[¶] … [¶]

"The defendant must have intended to commit or aided and abetted or been a member of a conspiracy to commit the felonies of robbery or burglary before or at the time that it caused the death.

"It is not required that the person killed be the victim of the felonies.

"An act causes death if the death is the direct, natural and probable consequence of the act and the death would not have happened without the act. A natural and probable consequence is one that a reasonable person would know if likely to help if nothing unusual intervenes. In deciding whether a consequence is natural and probable, consider all the circumstances established by the evidence.

"There may be more than one cause of death. An act causes death only if it is a substantial factor in causing the death. A substantial factor is more than a trivial or remote factor. However, it does not have to be the only factor that causes the death."

---

[13] This should have been "unintentional."

19.

*B.* *Analysis*

As noted above, the felony-murder doctrine does not apply if the killing is not committed by the defendant or an accomplice. (*Gonzalez*, *supra*, 54 Cal.4th at p. 654.) Defendant contends that the felony-murder doctrine does not apply here because the evidence shows that the robbery victim, Juan, was the "actual killer." Thus, defendant argues, it is irrelevant that his accomplice (Victor) was also a nontrivial cause of death, and the instructions to that effect were improper.

It is true that an accomplice merely being a proximate cause of a death is not enough to trigger the felony-murder doctrine. (*People v. Washington* (1965) 62 Cal.2d 777, 781.) The accomplice (or the defendant) must have also been the actual killer. (*Ibid.*) However, the jury could have reasonably concluded Victor was more than just a proximate cause of Orlando's death. Based on the circumstances described below, the jury could have reasonably concluded Victor was an "actual killer" as much as Juan was.

Initially, Victor had control of the gun. Victor rushed at Juan and the two men struggled over the gun. During the struggle, several rounds were discharged. Indeed, Juan testified that "we" (i.e., Juan and Victor) "were shooting towards … the kitchen." Thus, there was evidence that neither Juan nor Victor had complete control of the gun when the rounds were discharged.[14] This is important, because at least two acts go into a killing-by-firearm: (1) causing the gun to be facing a particular direction and (2) pulling the trigger. Here, the jury could have quite reasonably concluded that, during their struggle, Victor and Juan concurrently caused the gun to be pointed whatever direction it

---

[14] There was other evidence, such as Juan's statement to police, possibly suggesting Juan had more control of the gun when the shots were fired. However, the issue is merely whether the jury should have been instructed on this particular theory, not whether the evidence conclusively established it. The jury could have chosen to reject the evidence suggesting Juan had more control of the gun and instead accepted Juan's trial testimony that the shots were discharged *during* the struggle and indicating he only gained control of the gun after the clip had been emptied.

was facing when it fired the fatal shot.[15]  In other words, the jury could have reasonably concluded that Victor's shared control over the gun was such that he and Juan both "actually" killed Orlando.  The court's instructions properly permitted this possibility.

Defendant similarly argues the court should not have instructed on felony murder at all, because "there was substantial evidence" that Juan – not defendant or his accomplices – was the actual killer.[16]  However, that is not the standard for whether a court has erred in giving a substantive criminal instruction.  Courts must instruct on *every* theory of the case supported by substantial evidence.  (*People v. Young* (2005) 34 Cal.4th 1149, 1200.)  The fact that one theory is supported by substantial evidence (i.e., Juan was the sole killer) does not mean the court should not instruct on another theory that is also supported by substantial evidence (i.e., Victor's and Juan's concurrent acts killed Orlando).

Defendant nonetheless insists that the instructions erroneously *permitted* the jury to convict him on a felony-murder theory even if it concluded Juan was the only actual killer.  He focuses on this instruction:

> "There may be more than one cause of death.  An act causes death only if it is a substantial factor in causing the death.  A substantial factor is

---

[15] This scenario assumes Victor's gun fired the fatal shot, rather than defendant's gun. No one disputes there was sufficient evidence on which a jury could have concluded Victor's gun fired the fatal shot.

[16] While acknowledging that Orlando was *likely* killed by the gun Juan and Victor were fighting over, the Attorney General notes there was evidence from which a jury could conclude that defendant shot Orlando.

The evidence indicates that the gun Juan and Victor struggled over was the .45-caliber Colt pistol found on the couch after the incident.  Given that both .45-caliber and nine-millimeter casings were found at the scene, and the testimony that defendant fired several shots from a handgun towards the kitchen, a jury could reasonably conclude that defendant was wielding a nine-millimeter handgun.  The Attorney General observes that no forensic evidence establishes that the bullet that killed Orlando was .45-caliber.  This leaves open the possibility that Orlando was killed by a nine-millimeter bullet fired by defendant.

21.

more than a trivial or remote factor. However, it does not have to be the only factor that causes death."

Defendant argues these instructions were improper for "allowing Victor Hernandez to be a substantial factor in the death simply because he [was] a "non-trivial cause" of death when Alvarez was the actual killer." However, the court also instructed the jury:

"An act causes death if the death is the *direct*, natural, and probable consequence of the act and the death *would not have happened without the act*. A natural and probable consequence is one that a reasonable person would know is likely help [*sic*] if nothing unusual intervenes. In deciding whether a consequence is natural and probable, consider all the circumstances established by the evidence."

These instructions made clear that "causing" a death means committing an act that *directly* causes the death. As a result, the instructions, when read as a whole, did not permit a felony-murder conviction based on a perpetrator committing act that indirectly caused death through a cascading chain of events.

### III. Erroneous Instructions Concerning Provocative Act Murder Were Harmless

Defendant also argues the jury was mis-instructed on provocative act murder. We agree, but conclude the error was harmless.

The court instructed the jury as follows:

"To prove that a defendant is guilty of murder under the provocative act doctrine, the People must prove that: One, the defendant was an accomplice of Orlando Yepez, Victor Hernandez, Jose Hernandez, or William White in committing robbery in concert or burglary; two, in committing robbery in concert or burglary, Orlando Yepez, Victor Hernandez, Jose Hernandez, or William White intentionally did a provocative act; three, *Victor Hernandez, William White, Jose Hernandez, or Orlando Yepez knew that the natural and probable consequences of the provocative act were dangerous to human life and then acted with conscious disregard for life*; four, in response to Victor Hernandez's, Orlando Yepez's, Jose Hernandez's, or William White's provocative act, Juan Alvarez killed Orlando Yepez; and, five, Orlando Yepez's death was a natural and probable consequence of Orlando Yepez's, Victor Hernandez's, William White's, or Jose Hernandez's provocative act.

22.

"A provocative act is an act that:  One, goes beyond what is necessary to accomplish the robbery in concert or burglary; and, two, whose natural and probable consequences are dangerous to human life because there's a high probability that the act will provoke a deadly response."  (Italics, bold, and underline added.)

Later, the court instructed the jury:

"The People alleged the following provocative acts:

"Pointed a gun at Juan Alvarez without justification;

"Tried to shoot Juan Alvarez without justification;

"Stabbed, attempted to stab, or instructed others to stab Juan Alvarez with a screwdriver without justification.

"You may not find the defendant guilty unless you all agree that the People have proved that: One, Orlando Yepez, Victor Hernandez, William White, or Jose Hernandez committed at least one provocative act; and, two, at least one of those provocative acts was committed by Orlando Yepez, Victor Hernandez, or Jose Hernandez was a direct and substantial factor that caused the killing.  [¶]  However, you do not all need to agree on which provocative act was proved."

Defendant argues the court's instruction, particularly the portion italicized above, improperly permitted the jury to convict defendant of provocative act murder even if he did not personally harbor malice.  It merely required that defendant *or* an accomplice harbor malice. We agree the instruction was erroneous.

"Under the provocative act doctrine, when the perpetrator of a crime maliciously commits an act that is likely to result in death, and the victim kills in reasonable response to that act, the perpetrator is guilty of murder.  [Citation.]" (*Gonzalez*, *supra*, 54 Cal.4th at p. 655.)  "A murder conviction under the provocative act doctrine thus requires proof that the defendant personally harbored the mental state of malice, and either the defendant or an accomplice intentionally committed a provocative act …."  (*Ibid*.) "Malice will be implied if the defendant commits a provocative act knowing that this conduct endangers human life and acts with conscious disregard of the danger. [Citations.]"  (*Ibid*.)  Malice is also implied when the defendant aids and abets in the

23.

underlying crime with conscious disregard for human life.  (*People v. Mejia* (2012) 211 Cal.App.4th 586, 604 (*Mejia*).)  Thus, the doctrine can apply when either the defendant or his accomplice commits the provocative act.  (See *People v. Superior Court* (*Shamis*) (1997) 58 Cal.App.4th 833, 846.)

The Attorney General largely focuses on harmlessness.  However, on the issue of error, the Attorney General does briefly cite to *People v. Johnson* (2013) 221 Cal.App.4th 623, which stated that CALCRIM No. 561 adequately explains the requirement of implied malice.  (*Johnson*, *supra*, at p. 633.)  However, *Johnson* offered no analysis on the point.  Regardless, it is undisputed that a defendant "must *personally* possess the requisite mental state of malice aforethought …."  (*Mejia*, *supra*, 211 Cal.App.4th at p. 603, italics added.)  And it is clear that the jury instructions here permitted the jury to convict defendant even if he did not personally act with malice (so long as Victor, Jose, or Orlando acted with malice).  The instructions were therefore erroneous on this point.

### A. Harmlessness

Failure to properly instruct the jury of the mens rea requirements that apply to the defendant in a provocative act murder prosecution can be harmless in some circumstances.  (See *Gonzalez*, *supra*, 54 Cal.4th at pp. 662–667.)  " '[A]n instructional error that improperly … omits an element of an offense … generally is not a structural defect in the trial mechanism that defies harmless error review and automatically requires reversal under the federal Constitution.' [Citation.]  Instead, an erroneous instruction that omits an element of an offense is subject to harmless error analysis under *Chapman v. California* (1967) 386 U.S. 18 ….  [Citations.]  In general, the *Chapman* test probes 'whether it appears "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." [Citations.]' [Citation.]  The high court in *Neder* [*v. United* States (1999) 527 U.S. 1] analogized instructional errors that arguably prevent the jury from finding an element of an offense to the erroneous admission or exclusion of evidence.  [Citation.]  In such cases, 'the harmless-error inquiry must be essentially the

same: Is it clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error?' [Citation.]" (*Id.* at pp. 662–663.)

In analyzing this issue, courts look to the strength of the prosecution's evidence compared to the defense evidence. (E.g., *Gonzalez, supra*, 54 Cal.4th at p. 665.) If the jury resolved contested factual issues through other verdicts untainted by the alleged instructional error, we take those findings as a given in the prejudice analysis. (See *id.* at p. 664.)

Malice can be implied if the defendant aids and abets in the underlying crime with conscious disregard for human life. (*Mejia, supra*, 211 Cal.App.4th at p. 604.) We conclude that, given the jury's other findings and the evidence at trial, no rational juror could find defendant lacked this type of implied malice. Even when we momentarily disregard the challenged murder conviction, the remaining verdicts show the jury rejected defendant's version of events and concluded that he aided and abetted the home invasion robbery and personally discharged a firearm during the robbery. These findings necessarily establish that defendant knew of his accomplices' criminal purpose to commit robbery and intended to facilitate, promote, encourage or instigate the robbery. Juan's girlfriend told detectives the tattooed assailant (i.e., defendant) entered the home carrying a "long," "big" gun. Juan testified that during the robbery, defendant fired a gun at him several times. The jury clearly accepted that testimony, because it found true the allegation that defendant personally and intentionally discharged a firearm during the robbery.[17] The verdicts and trial evidence overwhelming support the conclusion that defendant aided and abetted the robbery with conscious disregard for life.

---

[17] We cite this factor not because defendant's firing of his gun at Juan is itself a material provocative act. Indeed, that act cannot be the provocative act on which liability is predicated, if it occurred after Juan fired Victor's gun. "By necessity, the provocative act must occur before a victim may make a lethal response. [Citation.]" (*People v. Briscoe* (2001) 92 Cal.App.4th 568, 584.)

Defendant does not dispute that the evidence supports the conclusion that he "personally acted with conscious disregard for life." However, he argues that a reasonable jury could have concluded that he (defendant) was provoked to shoot. Specifically, Juan's firing of Victor's gun in order to empty its clip constituted "considerable provocation." The remaining provocative acts were committed by Victor, not defendant. However, the prosecution only needs to establish that a defendant harbored malice when he or she committed the provocative act in question *or at the time he or she aided and abetted the underlying felony*. (See *Mejia*, *supra*, 211 Cal.App.4th at p. 604.) Here, the jury necessarily concluded that defendant knew of his accomplices' intent to commit robbery and intended to facilitate, promote, encourage or instigate the robbery. He then carried a firearm into the residence where the home invasion robbery was to occur. This was more than sufficient to show defendant was acting with a conscious disregard to human life *before* he or Juan ever fired a gun. This conduct clearly presents a real danger that any victims in the home could respond with lethal force. Thus, even assuming for the moment that a rational juror could conclude Juan "provoked" defendant to fire his weapon, the fact remains that he entered a home with a gun knowing that his accomplices intended to commit a home invasion robbery. It was

---

However, defendant's firing of the gun is relevant for a different reason. A defendant's conduct can speak to his mental state at a point in the recent past. For example, the fact that a defendant stole items from a victim after murdering her is circumstantial evidence that he formed intent to steal *before or during* the application of force to the victim. (*People v. Abilez* (2007) 41 Cal.4th 472, 506.) Here, defendant's firing of the gun during the robbery is relevant to his mental state before he fired the shots. Specifically, it is strong evidence that defendant was acting with conscious disregard for human life when he initially aided and abetted the robbery, even before Orlando was shot.

26.

clearly established that defendant harbored a conscious disregard for human life when he aided and abetted the home invasion robbery.[18]

## IV. Defendant has not Established Error Under *People v. Chiu*

Defendant cites *People v. Chiu* (2014) 59 Cal.4th 155 and argues that the natural and probable consequences doctrine "had been an invalid theory for first degree murder for several years." However, *Chiu* dealt with "first degree *premeditated* murder …." (*Id.* at pp. 158–159.) *Chiu* "does not affect or limit an aider and abettor's liability for first degree felony murder under section 189." (*Id.* at p. 166.)

## V. Simultaneous Punishment of Robbery and Murder was Permissible Under Multiple Victim Exception to Section 654

Defendant argues that his sentence for robbing Juan (count 2) should have been stayed under section 654, "since the robbery arose from the same course of conduct as the murder."

Section 654 prohibits double punishment for "[a]n act or omission that is punishable in different ways by different provisions of law…." (§ 654, subd. (a).) "By its language, section 654 applies only to '[a]n act or omission ….' " (*People v. Latimer* (1993) 5 Cal.4th 1203, 1211.) However, the Supreme Court has "engrafted" an additional set of circumstances in which double punishment is prohibited. (*Ibid*.)

" 'Whether a course of criminal conduct is divisible and therefore gives rise to more than one act within the meaning of section 654 depends on the *intent and objective* of the actor. If all of the offenses were incident to one objective, the defendant may be punished for any one of such offenses but not for more than one.' [Citation.]" (*People v. Latimer*, *supra*, 5 Cal.4th at p. 1208 italics added in original.)

However, this rule is subject to several caveats. One caveat pertinent here is that "crimes of violence against multiple victims [are] separately punishable. [Citation.]"

---

[18] Because this is the only instructional error and we have found it harmless, defendant's cumulative prejudice argument also fails.

27.

(*People v. Latimer*, *supra*, 5 Cal.4th at p. 1212.) A defendant who commits an act of violence by means likely to cause harm to several persons is more culpable than a defendant who harms only one person. (*People v. Newman* (2015) 238 Cal.App.4th 103, 114.)

Robbery and murder are crimes that unquestionably involve acts of violence under this exception. (*People v. Newman*, *supra*, 238 Cal.App.4th at p. 117.) Here, defendant was convicted for his connection to a violent killing of Orlando and a violent robbery of Juan. Accordingly, the court did not err in punishing the two simultaneously.

Defendant acknowledges that existing precedent supports this conclusion but insists the "policy" behind the multiple victim exception do not apply here. He argues the exception should not apply where the decedent became a victim after instigating the whole event and seeking to benefit from it. However, the fact that the decedent bore some responsibility for the events that transpired does not negate the fact that defendant committed crimes against more than one victim. Moreover, we must apply the law itself, not the policies behind the law.

Defendant also cites to three cases, arguing that it is never proper to punish a defendant for both felony murder and an underlying robbery. However, in each of those three cases, the victim of the murder was also the victim of the robbery. (*People v. Meredith* (1981) 29 Cal.3d 682, 685–686 [David Wade was robbery and murder victim]; *People v. Bracamonte* (2003) 106 Cal.App.4th 704, 707–708, disapproved on other grounds by *People v. Gonzalez* (2008) 43 Cal.4th 1118, 1130, fn. 8 [Joey Kovall was robbery and murder victim]; *People v. Boyd* (1990) 222 Cal.App.3d 541, 549 [Kenneth Burley was robbery and murder victim].) Thus, the cases are materially distinguishable as to the multiple victim exception.

**VI.** **The Matter Will be Remanded for Resentencing Due to Enactment of Senate Bill No. 1393**

" 'Prior to 2019, trial courts [had] no authority to strike a serious felony prior that is used to impose a five-year enhancement under section 667, subdivision (a)(1). Senate Bill 1393 removed this prohibition. [(2017–2018 Reg. Sess.)] (Stats. 2018, ch. 1013, §§ 1, 2.) The legislation became effective January 1, 2019. [Citation.]' [Citation.] Senate Bill 1393 applies retroactively to all defendants whose judgments were not final as of January 1, 2019. [Citation.]" (*People v. Bell* (2020) 47 Cal.App.5th 153, 198.) Defendant requests that we remand this matter so that the sentencing court can consider its newfound discretion.

" ' "Defendants are entitled to 'sentencing decisions made in the exercise of the "informed discretion" of the sentencing court,' and a court that is unaware of its discretionary authority cannot exercise its informed discretion." [Citation.]' [Citation.] Therefore, remand is required in these cases unless " 'the record shows that the trial court *clearly indicated* when it originally sentenced the defendant that it would not in any event have stricken [the] … enhancement" even if it had the discretion. [Citation.]' [Citations.]" (*People v. Bell*, *supra,* 47 Cal.App.5th at pp. 198–199.)

The Attorney General argues remand is unwarranted here because the court "clearly indicated it would not have dismissed the prior serious felony enhancement in any event." The Attorney General points to the fact that the sentencing court declined to strike defendant's strike prior. In making that ruling, the court stated that defendant's "criminal history clearly indicates that he was – he's an individual that the Three Strike Law was aimed to impose additional penalties and consequences. And, therefore, the court declines to accept the invitation to strike the strikes, and the strikes are not stricken at this time." The Attorney General argues this ruling clearly shows the court would not have dismissed the prior serious felony enhancements even if it had discretion to do so. We disagree. The court's ruling and statement on defendant's request to strike his prior

strike was "only a 'clear indication' of its views on *that particular* sentencing decision." (*People v. Bell*, *supra*, 47 Cal.App.5th at p. 200.)

The Attorney General also points to the court's imposition of the upper terms for the robbery and burglary counts, as well as the section 12022.5, subdivision (a) enhancement. The court stated: " '[T]he crime involved great violence; the victims were vulnerable; the defendant was armed at the time; the crime involved great planning; and the defendant has engaged in violent conduct in the past. His convictions are of increasing seriousness; he served prison priors; and has not done well on parole or probation. And there are no factors in mitigation." While the court clearly expressed its views as to its term selections, those rulings and statements do not "clearly indicate" what the court would have done with newfound discretion as to a separate sentencing issue: whether to strike the prior serious felony enhancements. Under Senate Bill 1393, courts now have broad discretion under section 1385 to strike the prior serious felony enhancements "in furtherance of justice." (§ 1385, subd. (a).) In exercising that broad discretion on remand, the court would not be limited to the factors considered in selecting upper terms of imprisonment. While there would likely be overlap between the two analyses, "[w]e cannot speculate from the court's statements and decision as to one sentencing issue to divine what the court would have done if it had broadened discretion on another sentencing issue." (*People v. Bell*, *supra*, 47 Cal.App.5th at p. 200.)

It is certainly possible – perhaps even probable – that the court will decline to strike defendant's prior serious felony enhancements under Senate Bill 1393. However, we cannot say that eventuality is *clearly* indicated on the record before us. This uncertainty, combined with defendant's right "to 'sentencing decisions made in the exercise of the "informed discretion" of the sentencing court,' " (*People v. Bell*, *supra*, 47 Cal.App.5th at pp. 198–199), counsel that we remand the matter.[19]

---

[19] We note that there has been another intervening change in the law cited by defendant: Senate Bill No. 620. (2017–2018 Reg. Sess.) (Senate Bill 620.) Since we are

**VII. Defendant Forfeited His Ability to Challenge Certain Fines, Fees and Assessments**

A.      *Failure to Object*

Defendant challenges the following fines and fees: a $10,000 restitution fine (§ 1202.4, subd. (b)); a $10,000 parole revocation fine (§ 1202.45); a $160 court security fee (§ 1465.8); and a $120 conviction assessment fee (Gov. Code, § 70373).  Specifically, he cites *People v. Dueñas* (2019) 30 Cal.App.5th 1157 in contending that it was improper for the court to impose the fines and fees without first determining whether defendant had the ability to pay them.

Section 1202.4, subdivision (d) provides that when the court sets a restitution fine above the statutory minimum, it "shall consider any relevant factors, including, but not limited to, the defendant's inability to pay …."  (§ 1202.4, subd. (d).)[20]  Because defendant's restitution fine was well above the statutory minimum, defendant could have raised the inability to pay issue and the court would have been required to consider it. Yet, "[d]espite having the statutory ability to object, defendant did not raise an ability to pay objection …."  (*People v. Aviles* (2019) 39 Cal.App.5th 1055, 1073–1074.)  As a result, he forfeited his ability to challenge the restitution and parole revocation fines. (See *ibid*.)

While the statutes providing for the court security fee and conviction assessment fees are different in that they *mandate* imposition of the fee/assessment, defendant could have made the same request as the *Dueñas* defendant but failed to do so.  (See *People v.*

---

remanding on the Senate Bill 1393 issue, the resentencing court should also consider its newfound discretion under Senate Bill 620 on remand.

Additionally, defendant's custody credits were miscalculated.  At resentencing, the court shall ensure the correct amount of custody credits are granted.

[20] While section 1202.4 has undergone some revisions since defendant's sentencing, subdivision (d) is the same now as it was previously.

*Aviles*, *supra*, 39 Cal.App.5th at p. 1074.)  Consequently, his challenges to those amounts are likewise forfeited.  (*Ibid*.)

        B.      *Defendant has not Established Ineffective Assistance of Counsel*

Defendant contends that if his claim is forfeited, his counsel was ineffective for failing to object to the fines and fees.

"To establish ineffective assistance of counsel, a defendant must show that counsel's representation fell below an objective standard of reasonableness under prevailing professional norms, and counsel's deficient performance was prejudicial, that is, there is a reasonable probability that, but for counsel's failings, the result would have been more favorable to the defendant. [Citations.]" (*People v. Sepulveda* (2020) 47 Cal.App.5th 291, 301.)

" 'On direct appeal, if the record " 'sheds no light on why counsel acted or failed to act in the manner challenged,' " we must reject the claim " 'unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation.' " ' [Citations.]" (*People v. Sepulveda*, *supra*, 47 Cal.App.5th at p. 301.)

Here, there is a theoretical explanation.  Counsel could have determined – on facts not developed in the present record – that defendant does indeed have the ability to pay or will obtain the ability to pay.  Because there is a conceivable explanation for counsel's lack of objection, any claim of ineffective assistance would need to be pursued in habeas so defendant can develop a record as to any potential explanations for the lack of objection.

## VIII.  Prior Prison Term Enhancements to Counts 1, 2, and 3 Must be Stricken

Defendant contends the court improperly used prior convictions to impose both prior serious felony enhancements and prior prison term enhancements to counts 1, 2 and

3.  The Attorney General concedes this was error, and we accept the concession.[21]  (See *People v. Jones* (1993) 5 Cal.4th 1142, 1144–1145.)  We will direct the sentencing court to strike the prior prison term enhancements to counts 1, 2, and 3 on remand.

## DISPOSITION

The matter is remanded for the sentencing court to (1) strike the prior prison term enhancements to counts 1, 2, and 3, and (2) consider how it would like to exercise the discretion granted by Senate Bill 620 and Senate Bill 1393.  In all other respects, the judgment is affirmed.


POOCHIGIAN, Acting P.J.

WE CONCUR:


SMITH, J.


SNAUFFER, J.

---

[21] In supplemental briefing, the parties also agree there is another basis for striking these enhancements: Senate Bill No. 136.  (2019–2020 Reg. Sess.)